**LANE–WELLS CO. v. M. O. JOHNSTON OIL FIELD SERVICE CORPORATION.**

**M. O. JOHNSTON OIL FIELD SERVICE CORPORATION v. LANE–WELLS CO.**

No. 11965.

United States Court of Appeals
Ninth Circuit.

April 24, 1950.

Harris, Kiech, Foster & Harris, Ward D. Foster, Los Angeles, Cal., for Lane-Wells Co.

Hill, Morgan & Farrer, Wm. M. Farrer, Los Angeles, Cal., Mellin & Hanscom, Oscar A. Mellin, San Francisco, Cal., for M. O. Johnston Oil Field Service.

Before HEALY and BONE, Circuit Judges, and DRIVER, District Judge.

DRIVER, District Judge.

This action was brought by M. O. Johnston Oil Field Service Corporation, hereinafter referred to as plaintiff, for a declaratory judgment that a patent, No. 2,029,491, granted to W. G. Lane February 4, 1936 on an application filed December 20, 1932, was invalid. Lane-Wells Company, a corporation, the owner of the patent, herein called defendant, by its counterclaim charged the plaintiff with infringement. The district court held the patent valid but not infringed and both parties appealed. Plaintiff appealed from the holding that claims 7–9, inclusive, and 11–14, inclusive, of the Lane patent were valid, and defendant appealed from the decision that the patent was not infringed.[1]

The Lane patent is for a gun type formation tester for well bores. The claims in issue on this appeal are combination claims.[2] They describe a device to be lowered in to a well bore to sample the fluid

---

[1] Another patent, Spencer No. 2,092,337, was included in the action, but no appeal was taken from an adjudication of its invalidity by the district court.

[2] "7. In combination; a packer adapted when set to divide a well casing into upper and lower zones; and a gun means suspended from said packer in said lower zone; said gun means arranged to drive a projectile through the surrounding well casing.

"8. In combination; a packer adapted when set to divide a well casing into upper and lower zones; a gun means suspended from said packer in said lower zone; said gun means arranged to drive a projectile through the surrounding well casing; and a formation testing device for collecting a sample of well fluid admitted into the lower zone through the perforation made by said projectile.

"9. A formation tester comprising: packer means providing a region sealed from the zones above and below said packer means; a gun unit disposed so as to fire a projectile from said region into the surrounding formation; and a receiving device arranged to receive fluid introduced into said region from the path made by said projectile.

\* \* \* \* \* \* \*

"11. A formation tester comprising: a gun unit adapted to be lowered into a well bore arranged to fire a projectile through a well casing into a surrounding formation; a sample receiving means having an inlet in proximity to said gun unit; and packer means for minimizing the introduction of fluids into said sample receiving means from sources other than the avenue provided by said projectile.

"12. In combination; a packer for dividing a well bore into two zones; and gun means connected with the packer for firing a projectile into the formation surrounding the well bore to open one of said zones to flow of fluids from said formation along the path formed by said projectile.

"13. A gun type formation tester comprising: a gun means adapted to be lowered into a well bore and fire a projectile into the adjacent formation to form a fluid channel from the formation into the well bore; and means for entrapping for withdrawal fluid entering the well bore from said channel and having an intake port connectible with said channel, said gun means and entrapping means forming a tool entity adapted to be lowered as a unit into a well bore.

"14. In combination; a packer for dividing a well bore into two zones; gun means connected with the packer for firing a projectile into the formation surrounding the well bore to open one of said zones to flow of fluids from said formation along the path formed by said projectile; and means for entrapping for withdrawal, fluid entering the perforated zone and having an intake passage connectible with said fluid receiving zone, said means adapted to be lowered with said packer and gun means and forming a tool entity therewith."

in the adjacent formation. The device consists of a gun mechanism for firing projectiles through the well casing, thus providing channels through which the fluid in the formation may flow into the well bore, a packer mechanism to pack off and isolate the section of the bore to be sampled and a sample receiver means for receiving and entrapping for withdrawal fluid entering the well bore through the channels formed by the projectiles fired from the gun mechanism.

It is conceded that all of the separate elements of the tool described in the patent claims, the packer, the gun mechanism for perforating the well casing and the sample receiver, were old and well known in the art at the time Lane first made his formation tester.[3] If the device involves invention, therefore, it must be by reason of the combination of the old elements. It is claimed that putting together the old elements does constitute a new and patentable combination tool. Instead of using the casing perforator gun and the packer with the sample receptacle separately, Lane conceived the idea of putting together the gun, packer and sample receiver. The combination tool would be attached to a string of drill pipe or the like and lowered into the bore. The gun would then be fired and a sample of the formation fluid taken into the receiving tube all in one operation. When the old elements were used separately the gun was first lowered into the bore and fired, was then removed, the packer and tester were lowered into the well, the

packer was set and the fluid sample taken. The average depth at which formation fluid tests are taken in the California fields is 4,500 feet and, so the trial court found, in the operation of separately running the perforator gun and formation tester there is an interval of several hours between the firing of the gun and the reception of the fluid sample in the tester.

■■■ We think that the bringing together of the old elements as was done in the Lane patent did not rise to the level of invention. It did not require more than the exercise of mechanical ingenuity of one skilled in the prior art.[4] The ease and simplicity with which the bringing together of the old elements can be accomplished is illustrated by the method of construction of plaintiff's accused device. Although, as the district court found, no gun type formation tester was ever constructed in substantial accordance with the drawings and specifications or having substantially the mode of operation of the Lane patent, the plaintiff, beginning in 1943, constructed and extensively operated commercially his accused combination tool. It was made by joining together by means of ordinary screw threads a standard Johnson Formation Tester (consisting of a packer and formation sample receiver tube) and a perforator gun. Defendant contends that certain advantages would result from the use of its combination tool, such as saving time and expense of operation, and in some circumstances the recovery of a less diluted and more representative sample of forma-

3. Examples of prior art patents are as follows:

    Patents disclosing packers for well bores, Burr & Wakelee, No. 68,350, issued in 1867; Cooper, No. 1,000,583, issued in 1911; Edwards, No. 1,514,585, issued in 1921; Harris, No. 1,683,031, issued in 1928; Burstoll, No. 1,710,203, issued in 1929; Fortune, No. 1,853,557; issued in 1932; and Wells, No. 1,926,017, issued in 1933.

    Patents disclosing well testers: McGreger, No. 582,828, issued 1897; Cox, No. 1,347,534, issued 1920; Steele, No. 1,602,864, issued 1926; Erwin, No. 1,-652,472, issued 1927; Johnston, No. 1,-790,424, issued 1931; Miller, No. 1,837,-788, issued 1931; Johnston, No. 1,842,-

270, issued 1932; and Simmons, No. 1,-930,987, issued 1933.

    Patents disclosing casing perforator guns: Mims, No. 1,582,184, issued 1926, and Rembert, No. 1,835,722, issued 1931.

4. Phillips v. City of Detroit, 111 U.S. 604, 4 S.Ct. 580, 28 L.Ed. 532; Concrete Appliances Co. v. Gomery, 269 U.S. 177, 184–185, 46 S.Ct. 42, 70 L.Ed. 222; Powers-Kennedy Contracting Corp. v. Concrete Mixing & Conveying Co., 282 U. S. 175, 51 S.Ct. 95, 75 L.Ed. 278; Toledo Pressed Steel Co. v. Standard Parts, Inc., 307 U.S. 350, 59 S.Ct. 897, 83 L. Ed. 1334; Bailey v. Sears Roebuck & Co., 9 Cir., 115 F.2d 904, 907; R. G. Le Tourneau, Inc. v. Gar Wood Industries, Inc., 9 Cir., 151 F.2d 432, 434.

tion fluid. The claimed advantages are considerably minimized in certain detailed findings of the trial court which we shall set out in the margin (see footnote 11, infra), but assuming for the moment that the Lane tool has such advantages it would not on that account be patentable. It is not sufficient that the device be new and useful. It must also be an invention or discovery.[5]

It is also our conclusion that the Lane device constituted only a bringing together in juxtaposition of old and well known elements; that whatever advantageous results were thus accomplished were not different in character from the aggregate results of the old tools; and that in the Lane device there was lacking that mutuality of action, that joint, cooperative functioning of the old elements to produce a new and different result, which is essential to raise a mere aggregation to the level of a patentable combination.[6]

Defendant reminds us of the rule, recognized by this court, that the questions of novelty and invention of a patented device are questions of fact[7] and defendant argues the findings of the trial court that the Lane patent involves novelty and invention should not be disturbed if the findings are supported by substantial evidence and not clearly erroneous. We accord full recognition to the rule but consider that for a number of reasons it is not determinative of the issues in the present case.

Although the district court found that the Lane patent disclosed a combination that was new and useful, the findings express doubt that the combination involved more than a mere aggregation of old elements or more than the ingenuity of a mechanic skilled in the art.[8] In the conclusions of law the court reiterated its doubts as to patentability but stated that the doubts had been resolved in favor of the defendant because of the presumption of validity arising from the issuance of letters patent by the patent office.

The trial court indicated by its treatment of the issue of infringement that it did not regard the Lane device as a patentable combination of packer, perforator gun and sample receiver of the breadth and character claimed by the inventor in the patent.[9] The Court held the patent to be "of a class as to which there is no room for equivalents," and limited the patent claims to "the precise device shown in the patent." The trial court's holding in that regard, as the defendant points out in its brief in support of the cross appeal, in practical effect rendered the Lane patent invalid and unenforceable. It clearly appears from the record that "the precise device" shown in the specifications and drawings of the patent was not of any practical commercial utility

5. Cuno Engineering Corporation v. Automatic Devices Corp., 314 U.S. 84, 90, 62 S.Ct. 37, 86 L.Ed. 58; R. G. LeTourneau v. Gar Wood Industries, 9 Cir., 151 F.2d 432, 434; Sehick Service v. Jones, 9 Cir., 173 F.2d 969, 974.

6. Hailes v. Van Wormer, 20 Wall. 353, 87 U.S. 353, 368, 22 L.Ed. 241; Reckendorfer v. Faber, 92 U.S. 347, 357, 23 L.Ed. 719; Palmer v. Village of Corning, 156 U.S. 342, 345, 15 S.Ct. 381, 39 L.Ed. 445; Grinnell Washing Mach. Co. v. E. E. Johnson Co., 247 U.S. 426, 433, 38 S.Ct. 547, 62 L.Ed. 1196; Toledo Pressed Steel Co. v. Standard Parts, 307 U.S. 350, 356, 59 S.Ct. 897, 83 L.Ed. 1334; Dallas Machine & Locomotive Works v. Willamette-Hyster Co., 9 Cir., 112 F.2d 623, 627; Fernandez v. Phillips, 9 Cir., 136 F.2d 404, 406.

7. Ralph N. Brodie Co. v. Hydraulic Press Mfg. Co., 9 Cir., 151 F.2d 91; Maulsby v. Conzevoy, 9 Cir., 161 F.2d 165; Refrigerating Engineering, Inc. v. York Corporation, 9 Cir., 168 F.2d 896; Faulkner v. Gibbs, 9 Cir., 170 F.2d 34, 37.

8. The trial court found:
"49. It is doubtful whether the claimed invention of the Lane patent involves more than a mere aggregation of old elements which produce a result not different in kind from that produced by using a formation tester and perforating gun separately.
"50. It is doubtful whether in effecting the combination of the perforator and tester as disclosed in the Lane patent in suit more than the ingenuity involved in the work of a mechanic skilled in the art was called into play."

9. The claims under consideration are set out in footnote 2.

without additions or modifications such as the ones to be found in the plaintiff's accused combination tool.[10]

Moreover, in its detailed and comprehensive findings of fact, the trial court in effect negatived much of the claimed advantageous results of the Lane device, thus, to say the least, adding weight and supports to its generally expressed doubts as to patentability.[11] For example, the court found

10. The lack of practical utility of the Lane device is indicated by the fact that although since 1932 the major part of defendant's business has been the manufacture and operation of perforating guns for perforating well casings it has never commercially manufactured or used a combination tool such as that shown in the Lane patent.

11. The trial court found:

"25. The average depth in a well bore of making a test, either water shut-off or production test, in the California fields wherein the accused device is operated, is approximately 4500 feet.

"26. The average height of a sample recovered in a tester is approximately 500 feet.

"27. At the time a formation or water shut-off test is to be made in the well bore, the well bore and its casing are customarily maintained full of mud fluid of a specific gravity heavier than formation fluid to its upper end, in order to safeguard against a blowout and loss of the well.

"28. A formation or water shut-off test is usually made at a point relatively close to the bottom of the oil well bore.

"29. The depth of penetration of bullets from commercial gun perforators in well casing in a loose unconsolidated sand is in the range from a minimum of just outside the casing to a depth of eighteen inches.

"30. The depth of penetration of bullets from commercial gun perforators in well casing in hard sandstone would be from zero penetration to a maximum of six inches.

"31. When the well is maintained substantially full of mud fluid, the device as disclosed in the Lane patent in suit is incapable of preventing the flow of the mud fluid under high velocity from the well bore into the lower end of the device, following the same path as the sample into the device and its tubing and mixing with the sample immediately after the packer of the device is released, and such mud fluid will continue to flow into the tester into the same chamber as the sample until the level of the fluid in the tester and its tubing equalizes with the level of the mud fluid in the well bore; however, a satisfactory sample could possibly be secured by adding a liquid cushion above the sample in the Lane apparatus before the packer is released and by employing a bean at the surface of the ground, thus controlling the rate of inflow of the mud to the apparatus after the packer is unseated.

"32. In the Lane patented device the ball valve 28 will not function to prevent mud fluid from entering the tester when the packer is unseated in normal use of a tester in the oil fields, as described above in findings Nos. 25–30.

"33. Under normal conditions, as described above in findings Nos. 25–30, the amount of mud fluid which will enter the Lane device and its tubing after releasing the packer will be many times the amount of the sample taken into the device and its tubing from the formation.

"34. Under normal and usual circumstances as described above in findings Nos. 25–30, the device of the Lane patent in suit, as disclosed therein, would be impractical in industry to recover and bring to the surface of the well a beneficial test sample, without the additional use of other auxiliary equipment or devices and operations not described or illustrated in the patent, and by a mode of operation not described or illustrated in the patent.

"35. The Lane patent in suit fails to disclose a device which is of any practical benefit to the oil industry, unless additional auxiliary devices or equipment not described or illustrated in the patent are used in connection therewith, to remove the sample from the device and elevate the sample to the surface of the well.

"36. The only operation which the device described and illustrated in the Lane patent has by itself, and with the mode of operation as set forth in that patent, would be the ability to be lowered into a well bore, set the packer to divide the well bore into an upper and lower zone, fire a perforating bullet through the well casing, and permit a sample to enter the tester; and such patent does not describe or illustrate any means or method for removing the sample from the tester to the surface of the well when making a test under normal and usual conditions, as described in findings Nos. 25–30.

"37. If the Lane device were employed to make a test and separate in-

that the Lane patent shows no means of bringing the fluid sample in the formation tester to the surface and that if a swab or bailer were used to recover the sample as much time would be consumed as in the separate use of the perforator gun and

strumentalities, such as bailers, were required to remove the test sample from the device so that the sample may be brought to the surface, as much time would be required, under the conditions described above in findings Nos. 25-30, to make the test and recover such sample as would be required by the use of a separate perforating gun and formation tester.

"38. Subjecting a candidate-oil-producing zone through perforations in a well casing to the pressure of the mud fluid in the well casing, for a matter of hours between perforating the casing and taking a formation test, would have some effect in retarding the flow of oil or native formation fluid from such zone into the tester, because of the penetration of filtrate water into the zone and the forming of mud cake in the perforations during the time interval between perforating and testing.

"39. A candidate-oil-producing zone is subjected to the pressure of the drilling mud from one to three hundred hours during drilling through the candidate zone; and throughout that period filtrate water from the drilling mud penetrates said zone and mud cake is formed over the exposed area thereof.

"40. When perforating and testing by separately running a formation tester and a perforating gun, the time interval between perforating and testing is a matter of several hours.

"41. By connecting the Johnston Formation Tester and the Johnston Perforating Gun together to make the accused apparatus and running it into the well bore, the time interval between perforating and besting (sic) is usually a matter of from four (4) to fifteen (15) minutes.

"42. The combination of a perforator and tester such as that described in the Lane patent in suit, No. 2,029,491, accomplishes under certain conditions a saving of time and money over the separate use of its elements. Upon making a production test of an oil sand in which the formation pressure is extremely low and far below normal formation pressure, the taking of a test immediately following perforation would result in obtaining a formation sample such as could not be obtained where a test is made in a matter of several hours after perforation.

"43. In perforating a well casing and making a production test, by separately running a formation tester and a perforating gun, the time elapsed between perforating and testing will permit an additional small amount of filtrate water to penetrate into the oil sands immediately surrounding the perforations.

"44. In running a perforator gun and a tester separately, where a sample of the formation fluid is obtained in the tester, the amount of filtrate water in the test sample would be from approximately one to five per cent more than would be obtained by running the tester and perforating gun together.

"45. When a sample of the native formation fluid is obtained in the tester, an increase of one to five per cent in the amount of filtrate water taken into the tester with said sample would not normally have any disadvantageous effect as far as the efficiency of the test is concerned, in determining the nature and characteristics of the native formation fluid.

\*   \*   \*   \*   \*   \*   \*

"68. When a perforating gun is connected to the lower end of a formation tester or sample receiver to be run into a well bore or well casing simultaneously, the operation of the gun does not change or modify the operation of the formation tester or sample receiver, and the operation of the formation tester or sample receiver does not change or modify the operation of the perforating gun.

"69. When a perforating gun is connected to the lower end of a formation tester or sample receiver to be run into a well bore or well casing simultaneously, each device separately operates in its old accustomed manner, and there is no change in the operation of either, save and except the length of the time interval between the operation of the two devices.

"70. In making water shut-off tests in well casing, there is no new or different result obtained by running the accused apparatus to perforate and make such a test over running a formation tester and a perforating gun separately to make the test, except a saving in time required to perform the operations.

\*   \*   \*   \*   \*   \*   \*

"75. If it is necessary to use a bailer or a swab to remove the test sample from the tester after it enters the tester, there is no time saving between running a combined tester and perforating gun over separately running the perforating gun and formation tester."

tester. The court also found that although in making a formation test by the separate use of gun and tester from one to five per cent more filtrate water from the drilling mud would enter into and dilute the formation fluid than in the combined use of gun and tester, such one to five per cent dilution would not ordinarily disadvantageously affect the test in determining the nature and characteristic of the native formation fluid.

In the situation disclosed by the record, therefore, we do not hesitate to express the opinion that the trial court erred in reaching the conclusion that the Lane patent involved invention.

Our decision as to invalidity of the Lane patent makes it unnecessary for us to consider the question of infringement.

That part of the judgment which holds claims 7–9, inclusive, and 11–14, inclusive, of the Lane patent to be valid is reversed.