## UNITED STATES HOFFMAN MACHINERY CORPORATION v. PANTEX PRESSING MACHINE, Inc.

District Court, D. Delaware. November 6, 1929.

No. 644.

Charles Neave and Maxwell Barus (of Fish, Richardson & Neave), both of New York City, and Wm. G. Mahaffy, of Wilmington, Del., for plaintiff.

Thomas G. Haight, of Jersey City, N. J., and Charles S. Jones and J. Granville Meyers, both of New York City, and Ward & Gray, of Wilmington, Del., for defendant.

MORRIS, District Judge. ▮ The sole defense to this suit charging infringement of claims 2 and 5 of patent No. 1,193,093 to Weinberger and claims 2 and 4 of patent No. 1,326,982 to Spencer is want of invention in view of the state of the art. Both patents are for improvements in garment pressing machines of the general type that has been in use for more than a third of a century. This type has two padded press plates. The lower plate, known as the bed or buck, is stationary and supports the garment. The upper, or head, is hinged upon an axis in the rear of the plates.

In the pressing operation, pressure, heat, and moisture are required. Pressure is brought about by the operation of a foot lever which forces the head, normally held away from the buck by a spring, down upon the garment. Heat is supplied by means of steam-heated chambers in one or both press plates. The necessary moisture is had from jets or sprays of steam projected, upon the movement of a lever, through perforations in the head or the buck. The original machines steamed from the buck only. To reach the garment's upper or outer surface, the improvement in the appearance of which is one of the main objects of the pressing operation, the steam, if from the buck, had to pass through and moisten the lining and the cloth of the garment. This gave rise to a difficulty, for, if the effect of the pressing operation is to be durable, the garment must not be moved until it is substantially dry. The drying required so much time that the original machines possessed but slight, if any, economic advantage over hand pressing. As a result, they did not go into very wide general use. In 1904 Hoffman conceived the idea of accelerating the drying process by steaming from the head and thus moistening the upper surface of the garment without wetting the lining and body of the cloth. Patent No. 928,199 was granted to him July 13, 1909, for a machine embodying that idea. The drying time was so shortened thereby that his machine went into wide use. His patent was sustained in Grever v. United States Hoffman Co., 202 F. 923 (C. C. A. 6) and in United States Hoffman Co. v. Becker & Wade Co., 224 F. 484 (C. C. A. 7). It was thought that Hoffman had solved the drying problem. In his patent No. 939,025 he said, "the important result obtained by applying the steam in the manner just described to the upper surface of the garment is to expedite the drying of the garment almost instantly upon the release of the mechanical pressure." The whole art, apparently, acquiesced in the views of Hoffman that he had supplied at one and the same time the means and the only means for instantaneous drying, for those entitled to use machines providing steam from the buck but not from the head either deemed it useless to look for another means or failed to find one.

This state of the art continued until Weinberger filed his application in 1915 for his patent granted in 1916. To the Hoffman type of machine Weinberger added a suction device to be operated during or immediately after the pressing operation for each lay or position of the garment upon the buck. This shortened by a few seconds the drying time for each lay. As 40 or 50 lays are required for pressing men's suits, the saving of a few seconds on each lay means a substantial increased daily output for each machine. In addition, Weinberger's invention meant great acceleration in the drying process of machines steaming from the buck. It enabled manufacturers to use with advantage and economy in place of the iron such machines upon the parts of garments that must be quite thoroughly moistened or wet when first pressed. Since, however, Weinberger's machine differs mechanically from the prior art machines only by the addition of the suction device, and since, before Weinberger's date, suction devices were employed for drying purposes, in the laundry art, patents No. 962,213 to Hagen and Cooper and No. 372,453 to Chasles and many other patents, in the hat-making art, patent No. 1,214,846 to Tracy and several other patents; and in the cloth-drying art, patents No. 426,970 to Stiner and No. 946,915 to Gessner, defendant asserts his claims lack invention because of aggregation and double use.

The Hagen and Cooper patent discloses a cuff-pressing machine comprising an unheated, pad-covered, hollow, perforated buck upon which the starched article, for ironing by engagement with the steam-heated head, is placed. The perforated buck is connected with a pump for forcing and sucking air through the buck pad for "removing the steam and moisture from the padded surface and the goods, thereby keeping the pad dry and delivering the articles in the best possible condition." The patent to Chasles shows a rotary ironing machine or "mangle" for flat pieces, comprising a steam-heated cylinder having a padded, external surface, rotating on a horizontal axis, and contacting with a polished, steam-heated surface of a semicylindrical concave trough between which the flat pieces to be ironed are fed. In this trough and extending longitudinally

across its center, Chasles makes perforations, and connects them with a suction device. Tracy employs suction in a hat-making machine to dry the felt kept moist during the stretching or shaping of the hat. Stiner and Gessner each discloses a machine for drying fabrics by forcing a current of air through the cloth when stretched. In fact, knowledge that moving air is a drying means or force is probably as old as civilization. Devices to put air in motion have been used for centuries. The specific objects to which this force has been applied for drying purposes have been numerous and the specific modes of application many.

The defense of double use presupposes, of course, that the suction device employed by Weinberger in connection with the old garment pressing machine was taken without substantial variation from the laundry, hat-making, or other art. This assumption may here be considered well founded. The real question is "whether the new application lies so much out of the track of the former use as not naturally to suggest itself to a person turning his mind to the subject, but to require some application of thought and study." Penn v. Bibby, L. R. 2 Ch. Ap. 127. I think the evidence hereinbefore stated makes it clear that the new application was not obvious. Notwithstanding the conditions existing in the art were such as to tend to incite those skilled in the art to make use of every known means to render the old garment pressing machines more efficient, years passed before Hoffman made his improvement. Apparently his disclosures were looked upon as constituting the full and only solution of the difficulties and problems theretofore existing. It was not realized by the art that a garment being pressed by the Hoffman machine was probably susceptible of more rapid drying than was being brought about by that machine. It remained for Weinberger to discover that susceptibility, to comprehend that the old suction device, properly adapted to and combined with machines of the Hoffman type, constituted means for taking advantage of that susceptibility and producing a new beneficial result. Weinberger was not only the first to make the application of the old device to a new use and the first to show how it could be made but he was the first to perceive and show the utility in making it. Such an application of an old device is not one naturally suggesting itself to a person turning his mind to the subject and is not double use.

■ Nor is Weinberger's machine a mere aggregation. While it is true that the placing of old elements in juxtaposition without a new function or effect is not combination, yet, when elements are so united that by their joint action on their common object they perform additional functions and accomplish additional results, the union is a true combination. And it is not essential "that the several devices or elements * * * should coact upon each other; it is sufficient if all the devices co-operate with respect to the work to be done, and in furtherance thereof, although each device may perform its own particular function only." Stutz v. Armstrong (C. C.) 20 F. 843, 847. Whether they coact successively or simultaneously is of no importance. Robinson on Patents, vol. 1, p. 222.

■ Spencer's patent is for a specific improvement upon Weinberger's invention. Weinberger followed Hoffman's improvement of steaming through the head. Spencer added the old means of steaming through the buck as well. For the "suction pump—*14*—or an equivalent device" of Weinberger, Spencer likewise substituted a steam ejector. The steam for operating the ejector he obtained from the boiler that supplies the steam for heating the chambers in the head or buck or both. The ejector was a well-known suction means and an equivalent for a rotary fan long prior to the filing of the Spencer application. In his patent No. 372,-453, Chasles uses "an ejector or fan" as his suction means, and employs "the same steam for working the ejector" as is used for the heating of the chambers in the bed or buck of his machine. British patent No. 3703 of 1912 to Paterson shows a press with a perforated buck and a steam-heated head. The steam employed for heating the head is there made to flow from the head, through a valve controlled pipe and an ejector for drawing air from the buck for drying purposes. In the Patent Office, the Examiner rejected the claims in suit upon the patent to Weinberger and the patent to Paterson. Upon appeal, the Examiners in Chief allowed the claims. The patentee is, of course, legally presumed to have known everything disclosed in the prior art, and, in determining whether there was invention, everything previously known to the art through patents, publications, or use must be taken into consideration. Patentability does not follow merely because the patentee has done what no one else had done before; otherwise complete anticipation would be essential in all cases to show invalidity. In addition to novelty and utility, it must appear that that which the patentee has accomplished is something which the ordi-

nary person skilled in the art would not know how to do if the occasion for it arose. The substitution of one element or device for another, which performs the same function in substantially the same way and accomplishes substantially the same result is presumed to be within the capacity of one skilled in the art. The substitution of a known equivalent does not amount to invention even if the substituted part performs the function better.

I find nothing in the case at bar to take it out of the general rule. I think the Examiner was right, and that Spencer's claims in suit are invalid for want of invention.