Jesse E. HALL, Weatherford Oil Tool Company, Inc., a corporation; Weatherford Spring Company of Venezuela, C. A., a corporation; Hall Development Company, C. A., a corporation; Weatherford, Ltd., a corporation; Weatherford Internacional, S. A., DE CV., a corporation; Nevada Leasehold Corporation, a corporation; Parker Industrial Products, Inc., a corporation, Appellants,

v.

Kenneth A. WRIGHT and B & W, Inc., a corporation, Appellees.

Kenneth A. WRIGHT and B & W, Inc., a corporation, Appellants,

v.

Jesse E. HALL, Weatherford Oil Tool Company, Inc., a corporation, et al., Appellees.

No. 14626.

United States Court of Appeals Ninth Circuit.

Jan. 16, 1957.

Rehearing Denied March 4, 1957.

Thomas E. Scofield, Kansas City, Mo., Philip Subkow, Los Angeles, Cal., for appellant.

Lyon & Lyon, Lewis E. Lyon, R. Douglas Lyon, Los Angeles, Cal., for appellee.

Before LEMMON, CHAMBERS, and HAMLEY, Circuit Judges.

HAMLEY, Circuit Judge.

On December 10, 1947, Jesse E. Hall, a citizen of the state of Texas, commenced this action against his competitors in the business of manufacturing and selling certain oil well bore cleaning devices. Named as defendants were Kenneth A. Wright, a citizen of the state of California, and B & W, Inc., a California corporation. Hall sought reformation of a certain contract, dated September 15, 1944, wherein the parties had attempted to resolve their differences. He also asked for a declaration of rights concerning the contract, as reformed; an injunction against asserted actual and threatened violations of the contract; and damages for the alleged violation of the antitrust laws of the United States.

Defendants answered, denying the principal allegations of the complaint. They also counterclaimed for a different declaration of rights concerning the contract; cancellation of the contract and an accounting; and for an accounting and damages by reason of Hall's asserted infringement of three patents issued to Wright and then held by B & W, Inc.

The devices manufactured and sold by the respective parties, concerning which this lawsuit arose, are used in the oil-production industry in preparing wells for production. Oil wells are drilled with a string of pipe carrying at the lower end a drill bit which is rotated with the pipe. Mud is forced into the drill pipe at the surface and is passed downward through the drill pipe, out through the opening of the drill bit, and back upward to the surface in the space between the pipe and the well bore. The principal purpose in circulating the mud is to flush the drill cuttings out of the well.

After the well has been bored, pipe or casing is usually inserted, for the purpose of lining the well bore. Cement is then placed between the casing and well wall at selected locations, to seal the formations to the casing and prevent migration of fluids along the casing. To improve the cement bond between the casing and well bore, it is desirable to remove the mud which has caked over the surface of the well bore during the drilling and mud circulation process.

The devices in question are used for this purpose. They are known as "scratchers," and each consists of a circular metallic collar from which extend numerous wire bristles. The devices are mounted on the casing throughout the zone to be cemented. They are attached to the pipe in such manner that they are free to rotate, and have limited longitudinal movement along the casing between stops secured to the outer surface of the casing.

When the casing is reciprocated, the scratchers abrade the surface of the well bore, with the result that the mud cake is effectively removed. While this is going on, liquid cement is pumped through the pipe so that it displaces the circulating mud and effects a seal between the abraded surface of the bore and the casing. The casing and hardened cement is then perforated, opposite the permeable sections of the formation, to permit recovery of oil.

Preceding the development of these scratcher devices there had been a long history of well-cementing failures. The oil-production industry was thus on the lookout for an effective solution of the problem. When it appeared that the devices which have been described, used in the indicated manner, would solve this problem, there developed a broad and lucrative market for their sale. Hall and Wright[1] each conceived that he was first in the field, and each sought to satisfy the market and, at the same time, exclude the other. As before indicated, the resulting conflict gave rise to this litigation.

The commencement of this action, however, failed to contain the controversy between the parties. Intense and widespread business friction, reflected in a staccato of fresh lawsuits, kept the competitive pot boiling during the next several years. As a result, new grievances arose, additional parties became involved, and the mere lapse of time accounted for a substantial change of conditions. In an effort to keep the instant suit abreast of these developments, there were amended pleadings and counter pleadings, interventions, motions, hearings, partial trials, stipulations, orders, preliminary injunctions, and a partial judgment.

By March 19, 1954, when the trial had finally been completed and the case was submitted, the questions for determination were these: (1) Were any or all of the patents valid? (2) If so, were the valid patents infringed? (3) Were either the defendants or the plaintiff guilty of unfair competition?

The trial court held that none of the patents was valid. Accordingly, the court did not reach the question of infringement. The court also held that the defendants and the plaintiff both were guilty of unfair competition, but that the unclean hands of the opposing parties precluded the granting of relief.

Judgment was entered dismissing the action and cross-action, but maintaining the status quo pending appeal. Plaintiffs and defendants appeal, each side contesting the holdings of the trial court which are adverse to their respective interests.[2]

We will first give consideration to the question of whether the trial court was correct in ruling that the patents are invalid. With regard to each of the four patents, this ruling was based upon a finding that the subject-matter of the patent lacked invention over the state of the prior art.

■ The question of novelty and invention of a patented device or method is a question of fact. Lane-Wells Co. v. M. O. Johnston Oil Field Service Corp., 9 Cir., 181 F.2d 707. A finding of fact that the subject-matter of a patent lacks invention over the state of the prior art should therefore not be disturbed unless the finding is clearly erroneous.[3]

■■ In determining whether there is invention, everything previously known to the art through patents, pub-

---

1. Including B & W, Inc., in which Wright had an interest.

2. Throughout the opinion, plaintiff and plaintiff-intervenors, who are the appellants, will be referred to as "Hall" or "plaintiffs." Defendants, who are the cross-appellants, will be referred to as "Wright" or "defendants." The patents which are involved will be referred to as follows: Hall patent No. 2,671,515 as No. 515, and Wright patents Nos. 2,338,-372, 2,374,317, and 2,392,352 as Nos. 372, 317, and 352, respectively.

3. Federal Rules of Civil Procedure, Rule 52(a), 28 U.S.C.A.

lications, or use, must be taken into consideration.[4] Much of the record consists of evidence submitted by the respective parties tending to show that the patents claimed by the other party were anticipated by previous patents, publications, or use. If as to any of these patents there is substantial evidence of such anticipation, it follows that as to such patent the finding of lack of invention is not clearly erroneous.

Concerning Hall apparatus patent No. 515,[5] the testimony and documentary evidence of such anticipation, although disputed, is substantial. Hall first applied for this patent on April 16, 1941. About a year and a half before that date, Phillip H. Jones and Dennis Berdine, engineers for the Union Oil Company, were commissioned to make experiments on the causes of failures in oil well cement jobs. These tests were made at Dominquez Hills, near Long Beach, California. There is evidence indicating that the B & W, Inc., device used by Jones and Berdine was very similar, structurally and functionally, to the device described in Hall patent No. 515.

It is apparent that, in sanctioning issuance of Hall patent No. 515,[6] the Board of Patent Appeals was of the view that it had not been established that the Jones and Berdine device was rotatably mounted. An engineer who conducted the test, however, testified at the

trial in this action that the device there used was rotatably mounted. The trial court apparently accepted this testimony as true. We have no basis for holding otherwise. The evidence as to the similarity of the two devices, and of the way they were mounted and used, is sufficient to sustain the finding of fact that Hall patent No. 515 lacked invention.

Regarding Wright apparatus patent No. 317, we likewise find the evidence, though again in dispute, sufficient to support the finding that this patent lacked invention. This patent was applied for on December 10, 1940, and was issued on April 24, 1945.[7]

There is first to be resolved a dispute between the parties as to the nature of the device covered by this patent. Hall contends that the patent calls for a non-rotatable collar with scratcher arms extending radially. The various devices which have been manufactured and sold under this patent during the last ten years or so, however, are intended for rotatable mounting and have sidewise bristles. It seems to be agreed that rotatable mounting and angular disposition of the scratcher wires are essential to the successful use of such devices.

The trial court made no finding as to the kind of mounting, or the angle of bristles, as called for in Wright patent No. 317.

The B & W, Inc., device which was used during the Jones and Berdine test

4. U. S. Hoffman Machine Corp. v. Pantex Pressing Machine Co., D.C.Del.1929, 35 F.2d 523, 525–526, modified 3 Cir., 44 F. 2d 685, certiorari denied 282 U.S. 904, 51 S.Ct. 217, 75 L.Ed. 796.

5. Claim 3 describes the invention as follows:
 "A well bore cleaning scratcher adapted to be rotatably mounted on a well casing comprising an annular support, stiff wire whiskers, each flexibly attached at one end to said support and each projecting from a point on the periphery of the support at an angular inclination having sidewise direction with respect to the radius drawn to said projection point of the particular whisker and all of said whiskers projecting in substantially the same angular relation from said support."

6. Issued on March 9, 1954, after extensive interference, public use, and other proceedings.

7. Claim 1 of the patent is illustrative of the device:
 "In combination, a tubular casing to be permanently installed in a well, a sleeve adapted to be secured on the casing to be lowered into a well thereon, a plurality of abrading fingers projecting from the sleeve in spaced relation to one another, the outer free ends of said fingers being adapted to engage the wall of a well bore into which the device is lowered, and means for yieldably supporting said fingers on the sleeve whereby the fingers may swing longitudinally of the sleeve."

was rotatably mounted. This is also probably true with respect to the units which were sold to Kelly and Sons, in December, 1939. The patent itself, however, makes no reference to the rotatable feature. In describing the attachment of the scratcher to the pipe, the word "secured" is used throughout the patent. Moreover, the patentee pointed out in his application that manipulation of the scratcher could be accomplished by rotation of the casing, as well as up-and-down reciprocation. This would not be true if the device was rotatably mounted.

Likewise, concerning the angle of the scratcher wires, the diagram which is a part of the patent document clearly indicates that the wires are to extend from the collar as an extension of the radii. There is no claim to a device utilizing nonradial tangential wires.

In reviewing the finding of fact as to invention, we will therefore regard patent No. 317 as specifying a nonrotatable device with radial arms.

On the question of whether this patent was anticipated, the record is anything but clear. Hall cited several previous patents as anticipating Wright patent No. 317. Most significant of these were the Shaw patent No. 764,684, issued on July 12, 1904, and the Black and Stroebel patent No. 2,151,416, issued on March 21, 1939.

The Shaw patent shows a "means for cleaning well-strainers" consisting of a tube upon which a number of brushes are mounted. This tube is reciprocated inside the casing, the purpose being to clean out perforations in the casing which have become plugged. The Black and Stroebel patent also covers a device for cleaning plugged perforations. The patent describes this as a body having a plurality of outwardly extending wire bristles secured thereto.

The trial court apparently believed that Wright patent No. 317 is structurally and functionally similar to the earlier patents which have been described Wright points out, however, that unlike his patent, neither the Shaw nor the Black and Stroebel patent makes reference to mounting on the outside of the casing, for the purpose of scouring the walls of the well. They were, instead, designed to scour the inside of the casing to clean perforations which had become plugged.

■ If, however, the devices are structurally and functionally similar, the fact that the Wright apparatus was intended for attachment to the outside of the casing would not be material on the question of invention. Mere application of a mechanical equivalent to another use is not invention. Pevely Dairy Co. v. Borden Printing Co., 9 Cir., 123 F.2d 17; John Bean Mfg. Co. v. Creagmile, 9 Cir., 123 F.2d 182.

We conclude that the finding of fact that Wright patent No. 317 lacks invention is not clearly erroneous.

The validity of Wright patent No. 352 specifying a "plug back method" is next to be considered. This patent was applied for on August 6, 1941, and was issued on January 8, 1946.

■ Patent No. 352 describes a method of placing a cement plug in a well bore. This is accomplished by first mechanically abrading the wall of the bore at the zone at which the plug is to be formed. After extraneous material and mud on the walls of the well bore have been thus dislodged, it is flushed out with circulating liquid. Cement slurry is then delivered to the zone at which the plug is to be formed. The slurry is mechanically agitated by the abrading means. The latter equipment is then withdrawn from the well, and the cement is allowed to set.

The record contains testimony by a consulting petroleum engineer that this plug-back method was used by the Union Oil Company of California at wells in its Rosecrans field as early as March 15, 1940. This would appear to not only support the finding of lack of invention,

but also to invalidate patent No. 352 on the ground of prior public use.[8]

 There is also evidence tending to indicate that various features of the plug-back method specified in patent No. 352 were anticipated in several prior patents. No single prior patent anticipated all of the elements of patent No. 352. Yet, the fact that all such elements are found in different patents in the same art is to be considered in determining whether invention or mere mechanical skill was involved. Fernandez v. Phillips, 9 Cir., 136 F.2d 404.

We hold that the finding of fact that Wright patent No. 352 lacks invention is not clearly erroneous.

The remaining patent to be considered on the question of validity is Wright method patent No. 372. The application for this patent was filed on August 19, 1939. The patent was issued on January 4, 1944.[9]

As in the case of Wright patent No. 317, there is a dispute as to the scope of the patent, which must be resolved before the question of invention can be explored. Hall contends that the method claimed in patent No. 372 does not include the process of cementing. Wright contends that it does. The trial court held in favor of Hall's contention, finding that this patent does not "teach, claim or even mention a method of cementing."

There is no express mention of cementing in the patent. While the patent contains several references to the process of "setting casing," that term is not defined. It was stipulated that, when casing is cemented, the cementing is a part of the setting process. But there was no agreement that setting was equivalent to cementing, though an attempt was made to elicit such an admission from Hall.

Defendants find significance in the word "fluid," as used in the patent. They presented expert testimony to the effect that the term was used broadly to include cement or any sealing agent used to seal an imperforated casing in the well bore. Examination of the patent fails to substantiate this view. The term "fluid" is there used in describing three operations. One of these is the circulation of thin mud during the drilling process. Another is the obtaining of petroleum liquids after the well is in production. The third is the circulation of "fluid" during and after the abrading operation, to carry away the freed mud cake and to prevent the reformation of such cake.[10]

Perhaps the most convincing evidence that patent No. 372 does not embrace a cementing process is to be found in the history of the patent proceedings. As before indicated, the original application made no reference to cementing. The Jones and Berdine tests were thereafter run, in which the abrading method was used in connection with cementing operations. Wright then, on May 11, 1940, added a new claim, which included the cementing procedure. This claim was at first deemed allowable. But when

---

8. 35 U.S.C.A. § 102 provides:
 "A person shall be entitled to a patent unless—
 * * * * *
 "(b) the invention was patented or described in a printed publication in this or a foreign country or in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States * * *."

9. The method covered by this patent is stated in claim 3 of the patent:
 "The method of preparing a well for production comprising providing a tubular production string with abrading means, lowering said string into the well, ma-

nipulating said string to cause said abrading means to abrade the wall of a portion of the well and thus expose the virgin earth formation, and then utilizing the selfsame string to conduct the fluid yield from the earth formation, thus exposed."

10. In reference to this latter use of the term "fluid," Wright said, in his brief to the Board of Appeals, "This fluid, say clean water or oil * * *" It is plain from this that clear liquid of some kind was intended for this flushing process. It is nowhere stated that such "fluid" is to be used in any kind of a sealing process.

Wright thereafter amended his entire application to clearly include the cementing operation, the examiner reconsidered, and rejected the new claim. He did so on the ground that it contained a reference to new matter, the original specifications having made no mention of cementing.

■■■■■ It is a well-known rule of patent construction that a claim in a patent must be read and interpreted with reference to claims which have been rejected. Claims which have been allowed cannot, by construction, be read to cover what has thus been eliminated from the patent. Schriber-Schroth Co. v. Cleveland Trust Co., 311 U.S. 211, 61 S.Ct. 235, 85 L.Ed. 132, rehearing denied 312 U.S. 654, 714, 61 S.Ct. 727, 728, 85 L.Ed. 1143, 1144.

Defendants argue that, even if Wright did not conceive that his method of well completion included the art of cementing a well, the inventor is nevertheless entitled to any use to which his invention may be put.

■■■■■ The cases cited in support of this assertion all deal with apparatus patents. The inventor of an apparatus is entitled to the benefit of every use of a patented device, because, whatever such use may be, the device is still his invention. But a method patent is directed to the performance of a particular art specified in the patent. It follows that, if a different art is served from that which is specified, the method must be considered different.

■■■■■ For the reasons indicated above, we hold that the finding of fact that patent No. 372 does not include the process of cementing is not clearly erroneous.

■■■■■ The examiner rejected the principal claims of Wright patent No. 372 as unpatentable over a patent (No. 1,342,-618) issued to one Bashara, on June 8, 1920. This patent relates to a tool for cleaning from the interior of a production string, material which has accumulated as a result of prolonged production of well fluid. The tool includes a length of pipe run into the production string, with spaced brushes attached thereto. As the pipe is reciprocated, fluid is discharged through the brushes and at other points. The examiner held that this device could be used equally well to abrade the mud cake on the surface of the well bore. The Board of Appeals of the United States Patent Office reversed, holding that the art of record does not suggest such a use.

The art of record (though not the Bashara patent) does show prior use of the production string as a mount for an instrument designed to clean the mud from the wall of the bore. It was also old in the art to reciprocate the production string for this purpose. Bashara, and perhaps other patents, contemplated the flushing of freed materials through the use of circulating fluid. Thus, the essential features of Wright patent No. 372 were already in use, though not under one patent, or, in all cases, for the purpose of abrading the surface of the well bore. Wright patent No. 372 is the first to suggest that a brushlike abrading device be designed for attachment to the production string. But, if there was novelty here, it resided in the apparatus rather than in the method.

The record is far from conclusive in favor of the finding of fact that Wright patent No. 372 lacks invention. We are of the view, however, that such finding is sufficiently supported in the evidence so that we must hold it to be not clearly erroneous.

The foregoing leads to the conclusion that the trial court did not err in holding invalid all of the patents in issue.

The finding and conclusion that none of these patents is valid disposes of the question of patent infringement.

■■■■■ As to both plaintiffs and defendants, the trial court found that there were acts of unfair competition, but that the opposing party's own unclean hands precluded the granting of relief. Under the "clean hands" doctrine, one who does not come into equity with clean hands, and keep them clean, must be denied all

relief, whatever may have been the merits of his claim.[11]

The facts which, in the opinion of the trial court, establish unclean hands include, as to each side, many of the facts also relied upon as establishing unfair competition. But the legal significance to be accorded these facts may not be the same. Conduct which may be found to call for application of the doctrine of unclean hands may or may not constitute unfair competition under the substantive law of California.[12] In applying the clean hands maxim, the court is "concerned primarily with protecting its own integrity from improper action by a party." [13]

The conclusion of the trial court that defendants must be denied relief under the doctrine of unclean hands appears to be based upon the following findings of fact:

(1) Before and during the pendency of this litigation, defendants "unfairly and without cause" notified customers of plaintiff and plaintiff-intervenors that such customers were infringing Wright method patent No. 372 and Wright apparatus patent No. 317, by the use of scratchers in cementing operations incident to completion of oil wells. These notices were given without intent that they serve as a preliminary to suit. They were not given in good faith, because patent No. 372 does not cover cementing operations. These threats and notices were given in order to establish a limited monopoly in the manufacture and sale of scratchers not covered by patents Nos. 372 or 317.

(2) During the pendency of this litigation, defendants caused to be organized Scratchers, Inc., a Nevada corporation; caused that corporation to acquire legal title to the Black and Stroebel patent No. 2,151,416; and caused the new corporation to file four suits against plaintiff-intervenors in Texas, Oklahoma, and Mexico, which suits were later, by stipulation, dismissed without prejudice. These suits were instituted to serve as a basis for sales propaganda to the trade.

The conclusion of the trial court that plaintiffs must be denied relief under the doctrine of unclean hands appears to be based upon the following findings of fact:

(1) Before and during the pendency of this litigation, plaintiffs notified the trade and the customers of the defendants that plaintiffs were entitled to an accounting from the trade for all Multiflex and Nu-Coil scratchers purchased from B & W, Inc., and were entitled to a royalty of $2.50 per scratcher. The notices were given "unfairly and without cause and without any intent that such notices serve as a preliminary to suit." The notices were not given in good faith, as a royalty of $2.50 per eight-dollar scratcher "would not be within the bounds of economic reason."

(2) Plaintiffs have caused a multiplicity of suits to be filed involving one phase or another of their controversy

11. Hazel-Atlas Co. v. Hartford Co., 322 U.S. 238, 64 S.Ct. 997, 88 L.Ed. 1250, rehearing denied 322 U.S. 772, 64 S.Ct. 1281, 88 L.Ed. 1596; Precision Instrument Mfg. Co. v. Automotive Maintenance Mach. Co., 324 U.S. 806, 65 S.Ct. 993, 89 L.Ed. 1381, petition for clarification denied 325 U.S. 843, 65 S.Ct. 1561, 89 L.Ed. 1967, rehearing denied 325 U.S. 893, 65 S.Ct. 1189, 89 L.Ed. 2005; Mas v. Coca-Cola, 4 Cir., 163 F.2d 505; Root Refining Co. v. Universal Oil Products Co., 3 Cir., 169 F.2d 514, certiorari denied sub nom. Universal Oil Products v. William Whitman Co., Inc., 335 U.S. 912, 69 S.Ct. 481, 93 L.Ed. 444, rehearing denied 336 U.S. 915, 69 S.Ct. 601, 602, 93 L.Ed. 1079.

12. That the substantive law of California governs on the question of unfair competition, see: Fashion Originators' Guild of America v. Federal Trade Commission, 312 U.S. 457, 61 S.Ct. 703, 85 L.Ed. 949; Pecheur Lozenge Co. v. National Candy Co., 315 U.S. 666, 62 S.Ct. 853, 86 L.Ed. 1103; National Van Lines v. Dean, 9 Cir., 237 F.2d 688.

13. Frank Adam Electric Co. v. Westinghouse Elec. Mfg. Co., 8 Cir., 146 F.2d 165, 167.

with defendants. Suits of this character were instituted in Kansas, Texas, Canada, Venezuela, and Mexico. These suits were instituted to serve as a basis for sales propaganda to the trade.

The court also found that both plaintiffs and defendants have employed and practiced techniques to influence the placing of business by the larger oil-producing companies, "which techniques involved everything from veiled threats to adroit suggestions in an effort to make the oil companies feel more secure, patent-infringementwise," if they would direct their business to the parties employing such techniques.

In our view, the findings of fact just summarized are not clearly erroneous.

▋ The conclusion from these facts, that all parties were guilty of unclean hands, was based partly upon the view that the described conduct was inequitable regardless of the pendency of this suit. But the prime consideration which led to the conclusion in question was unquestionably the fact that, as established by the findings, each party indulged in self-help after this action was instituted.

We think the court was entirely correct in holding that such acts of self-help called for application of the doctrine of unclean hands. None of the parties was content to rely, for relief, on adjudicatory processes which were placed in motion when this suit was filed. Each waged battle not only in this case, but in other cases thereafter instituted, and on a dozen business fronts here and abroad. While each party can doubtless find justification for his conduct in some instances, the over-all flavor smacks too plainly of self-help to be overlooked.

It is recognized that, under certain circumstances, a patent holder or patent applicant must proceed with infringement litigation against third parties while testing the validity of competing patents in the prime action. Otherwise, rights may be lost through the lapse of time. But here the trial court found that the lawsuits commenced during the pendency of this case were not sincerely instituted. They were, the court found, intended as a basis for sales propaganda to the trade. While this finding may not be supportable as to all such suits, we believe it is a fair generalization. As before indicated, litigation was but one phase of the side battle these parties waged during the pendency of this action.

The conduct of the parties in the respects mentioned immensely complicated the issues of this case and seriously delayed the entry of final judgment. The running skirmish in which the parties indulged through the years since 1947, when this case was begun, kept the controversy in a constant state of flux and confusion. It became more and more difficult to pin the case down to a settled state of facts which would permit of a clear-cut judicial determination. Moreover, the changed circumstances thus produced finally made it almost impossible to render justice between the parties with any measure of assurance. The conclusion of the trial court that it had been imposed upon is thoroughly justified.

We hold that the trial court did not err in denying relief to all parties, under the doctrine of unclean hands. Accordingly, we do not reach the question of whether the trial court was correct in holding that all parties were guilty of unfair competition. Past inequitable conduct, of course, is merged in the judgment which has been entered.

Affirmed.

▋ Plaintiffs and defendants, respectively, shall share equally the cost of transcribing and printing the record. Other costs on appeal shall be borne by the parties incurring them.