**PRODUCERS LUMBER & SUPPLY COMPANY, Inc., Appellant,**

v.

**OLNEY BUILDING COMPANY, Appellee.**

No. 13543.

Court of Civil Appeals of Texas.

San Antonio.

March 3, 1960.

Rehearing Denied March 30, 1960.

Bruce Waitz and Morris L. Collins, San Antonio, for appellant.

Max N. Clifton, Uhl & Wells, John Peace, San Antonio, for appellee.

MURRAY, Chief Justice.

This suit was instituted by Producers Lumber & Supply Company, Inc., against Olney Building Company, a corporation, seeking to recover damages resulting from the conduct of H. P. Orts, president of defendant, when he caused his construction superintendent and a large crew of men to go upon Lot 8, Block 9, New City Block 12459, Northeast Park, an addition situated in the corporate limits of the City of San Antonio, Bexar County, Texas, owned by plaintiff, and demolish a dwelling constructed thereon by Olney Building Company.

The trial was to a jury and, based partly upon the verdict of the jury, the trial court rendered judgment in favor of plaintiff against defendant in the sum of $600. Producers Lumber & Supply Company, Inc., has prosecuted this appeal, contending that the judgment should have been in the sum of $5,900.

The issues submitted to the jury and the answers thereto are as follows:

"Question No. 1: Do you find from a preponderance of the evidence that H. P. Orts, as president of Olney Building Company, acted in good faith in erecting the building on the plaintiff's lot?

"Answer 'Yes' or 'No.'

"We, the jury, answer: Yes.

"Question No. 2: What do you find from a preponderance of the evidence would be the reasonable and necessary cost of restoring the lot in question to substantially the same condition that it was in immediately before the construction was commenced thereon?

"Answer by stating the cost:

"We, the jury, answer: $600.00.

"Question No. 3: Do you find from a preponderance of the evidence that H. P. Orts, as president of Olney Building Company, acted maliciously in removing the building from the lot in question?

"Answer 'Yes' or 'No.'

"We, the jury, answer: Yes.

"Question No. 4: What sum of money, if any, do you find from a preponderance of the evidence is the plaintiff, Producers Supply & Lumber Company, entitled to receive as exemplary damages, if any, as that term is defined hereinbelow?

"Answer by stating the amount, if any:

"We, the jury, answer: $300.00."

The parties stipulated that the dwelling on Lot 8 had a value of $5,000, and that the dwelling had enhanced the value of Lot 8 by $5,000.

After the verdict was returned, appellant moved that the jury's answer to Question No. 1 be disregarded, and for a judgment in its favor in the sum of $5,900, while appellee moved that the jury's answer to Questions Nos. 3 and 4 be disregarded and judgment for appellant be confined to the sum of $600. This latter motion was granted and judgment rendered accordingly.

Appellant assigns as error the trial court's action in sustaining appellee's motion to disregard the jury's answers to Special Issues Nos. 3 and 4. The jury's answers to these issues were well supported by the evidence, were very material and the court erred in setting them aside. Special Issue No. 3 inquired whether H. P. Orts, as president of appellee acted maliciously in removing the building from Lot No. 8. The jury very properly found that he did. It might be well here to make a rather complete statement of the evidence in the case. H. P. Orts owned several corporations and was the head and general manager of them all, including Olney Building Company. Prior to November 1, 1956, Elliott Construction Co., Inc., hereinafter referred to as Elliott, was the owner of Lot 8, Block 9, New City Block 12,459, involved herein. On that date H. P. Orts, executed a warranty deed, which was properly recorded, from Elliott Construction Co., Inc., as its Assistant Secretary and Agent and Attorney in Fact, to Producers Lumber & Supply Co., appellant herein, conveying Lot 8 for a consideration of $1,428. The lot was purchased by appellant with the intention that later its general manager, George R. Montgomery, and his wife would build a home for themselves thereon. Montgomery and wife had the lot graded and planted some trees and grass on it. On or about February 27, 1958, Orts and Elliott decided to construct nine dwellings, one on Lot 8, and eight on other nearby lots. Orts called A. L. Burden, secretary-treasurer of appellee, and asked him whether Lot 8 had been sold. Burden, after consulting a map on the wall, assured Orts it had not been sold. Orts inspected Lot 8 and noticed the trees planted there, he thought it was nice of someone to plant trees on this lot. Shortly

thereafter the construction of the nine houses was begun, on April 1, 1958, appellee ordered Stewart Title Company to issue a Title Binder covering all nine lots to Frost National Bank in connection with appellee's interim financing. On April 14, 1958, Orts learned from the Title Company that Lot 8 had been sold to appellant. Orts then notified Mr. Montgomery of the circumstances, and this was the first notice to appellant that construction had been commenced on its lot. The dwelling on Lot 8 had been almost completed when the discovery was made. The house had been constructed without the knowledge or consent of appellant and against its wishes, and contrary to the plans that Montgomery and wife had for their own home. Orts began negotiations with Montgomery, trying to reach an amicable settlement of the matter. Orts told Montgomery that he, Montgomery, had him at his mercy. Various offers and counter-offers were made, but no settlement had been reached, when suddenly on April 22, 1958, Orts broke off negotiations and sent his construction superintendent with a large crew of men and heavy equipment to Lot 8, and demolished the dwelling constructed thereon, leaving nothing but a heap of crude building material and debris. With reference to the destruction of this dwelling, Orts testified as follows:

"Q. Now, you did, on or about April 22, 1958, remove those improvements, did you not? A. That is correct, sir.

"Q. Did you notify Mr. Montgomery or anyone from Producers Lumber and Supply Company that you were going to remove them? A. No, sir.

"Q. How many men do you remember employing on the job of removal? A. Does this have to be exact, or will an approximation do?

"Q. Well, if you know, tell me exactly; otherwise, it has to be approximately. A. I will say—I am going to say ten.

"Q. Approximately ten? A. Yes.

"Q. Isn't it a fact that you started the removal of these improvements about 2:00 o'clock in the afternoon? A. That is correct, sir.

"Q. Isn't it a fact that by 6:00 o'clock in the afternoon, by the use of a bulldozer and a dozen or more men, you had completely removed everything but the slab? A. That's right.

"Q. Isn't it a fact that you made no effort to salvage anything on the removal? A. No, sir.

"Q. You say that is not true? A. No, sir.

"Q. What did you salvage? A. All of the interior partitions, the exterior partitions, the siding, not the siding, but the exterior sheeting, the roof sheeting, electrical and plumbing.

"Q. Well, now, actually what happened was that several of your men went out and tore the roof off, isn't that right? A. That's right.

"Q. And then you, for lack of a better word I will say 'unjointed', the corners and then you hooked on with a dozer and dragged the partitions and framing and roof trusses across the street, is that right? A. Partially, that is correct.

"Q. You say that is not true? A. Not all of it.

"Q. What is not true? A. The side walls were taken down piece by piece.

"Q. The side walls were taken down piece by piece? A. Yes, sir. * * *

"Q. You said that you salvaged the electrical? A. Yes. * * *

"Q. Now, who did you employ to remove the slab? A. My superintendent.

"Q. How did Crea Brothers get on the job? A. I hired their equipment.

"Q. What equipment did you hire from Crea Brothers? A. A D-12 tractor, and I believe that slab was so good they couldn't get it up with a D-12 and finally they had to get a crane with a drop hammer, and I told my superintendent if Crea Brothers didn't have the—well, frankly, I don't know where I got the crane with the drop hammer.

"Q. Isn't it a fact that they also used a couple of air hammers? A. Oh, yes.

"Q. Air hammers, and they had to use torches to cut the steel? A. That is correct."

With reference to the destruction of the dwelling Orts further testified as follows:

"Q. So the night you tore that house down, $2,768.00 went down the drain; is that right? A. Yes, sir. My money.

"Q. Yes, sir. $2,768.00 went up just like that (slapping hands together)? A. That is right.

"Q. As if you had set a match to it, didn't it? A. That is right."

■ It cost more than $1,300 to put the concrete foundation in, and, of course, it was worthless after the crane and drop hammer, cutting torches, etc., had been used upon it. This and other evidence clearly supports the finding of the jury that H. P. Orts, as president of appellee, acted maliciously in removing the building from Lot 8.

■ The finding of the jury that appellant was entitled to recover exemplary damages in the sum of $300 was also fully supported by the evidence.

The jury found in answer to Special Issue No. 1, that Orts had built the dwelling on Lot 8 in good faith. The evidence shows that at the time he began the construction of the dwelling there was a deed on record signed by Orts, conveying this lot to appellant. Orts simply forgot about signing this deed some eighteen months before. Hall v. Wilson, Tex.Civ.App., 215 S.W.2d 204; Warwick v. Harvey, 158 Md. 457, 148 A. 592, 68 A.L.R. 288.

In 23 Tex.Jur. 393, § 17, it is stated:

"A person contemplating the improvement of land is under a duty to investigate the records before he commences work, because there may be information available therein which would prevent him from being regarded as a possessor in good faith. Thus a duly recorded deed containing a sufficient description of the land in question and vesting title in another would be sufficient to impart notice of the existence of an outstanding claim, * * *."

However, if the evidence may be regarded as sufficient to support the jury's answer to Issue No. 1, appellee cannot prevail upon his plea of improvement in good faith, because of his malicious destruction of the dwelling he had constructed on Lot 8.

The law at one time was quite clear that where a person erects a building upon the land of another without his knowledge and consent the building became a fixture and belonged to the owner of the land and the builder was without remedy. Foxworth-Galbraith Lumber Co. v. Thorp, Tex.Civ. App., 86 S.W.2d 644; Rotan Grocery Co. v. Dowlin, Tex.Civ.App., 77 S.W. 430; 23 Tex.Jur. 94, § 71, et seq.; 23 Tex.Jur. 375, § 3; 42 C.J.S. Improvements § 3, pp. 423–424; 42 C.J.S. Improvements § 6a, pp. 428–429; 27 Am.Jur., 261, § 3. This rule was regarded as harsh, but was thought necessary to make people careful with reference to their examination of the title to the land upon which they place buildings and other permanent improvements. 14 R.C.L. 17–19, § 5.

■ It is only where a person places permanent improvements upon land belong-

ing to another in a good faith belief that he is the owner of the land, that he has any remedy at all. Luker v. Luker, Tex. Civ.App., 226 S.W.2d 482; 42 C.J.S. Improvements § 6a, pp. 428–429; Schleicher v. Schleicher, 120 Conn. 528, 182 A. 162, 104 A.L.R. 577; Consolidated Freight Lines v. Groenen, 10 Wash.2d 672, 117 P.2d 966, 137 A.L.R. 1078. Where he has built such improvements in good faith, he has a somewhat limited right to go into court, and upon proof of such good faith ask the court to grant him equitable relief. Bonner v. Wiggins, 52 Tex. 125; 27 Am. Jur. 261, § 3. Under such circumstances, a court of equity may grant relief in several ways. If the building can be removed without great injury to the building or to the land, the court may permit the improver to move the building. Salazar v. Garcia, Tex.Civ.App., 232 S.W.2d 685. Where the building cannot well be removed the court or jury can find the market value of the land before and after the making of the improvement, and allow the improver to recover for the amount of this enhanced value, if any. The landowner will first be permitted to pay the enhanced value and keep the land, but if he is unable or unwilling to do so, then the improver may be permitted to pay the value of the land before the improvements were placed thereon, and thus become the owner of the land and the improvements. Rzeppa v. Seymour, 230 Mich. 439, 203 N.W. 62. If the landowner is unable to pay for the improvements and the improver is unable to pay for the land, then the court may order the land and the improvements sold to the highest bidder and the money divided between the owner and the improver as their respective interests appear. Or the court may give the improver judgment for the amount the lot has been inhanced in value, together with a lien against the lot to secure the payment of the judgment. 27 Am.Jur. 282, §§ 29 and 30.

■ Under no circumstances is an improver authorized to go upon the land of another, without his knowledge and consent, and demolish the improvements that he has through mistake placed thereon, and if he does so he commits waste and can be required to pay the landowner for such waste. 1 Thompson on Real Property 262, § 174; 42 C.J.S., Improvements §§ 4a and 4c, pp. 425–427; 27 Am.Jur. 261, § 3.

■ When Orts went upon Lot 8 without the knowledge or consent of appellant and demolished the dwelling he had placed thereon, he committed waste and must pay appellant for the value of the dwelling he destroyed, which as stipulated by the parties is the sum of $5,000. And Orts will not be heard to claim, in equity, reimbursement for the amount he had enhanced the value of the lot by the erection of the dwelling thereon. He resorted to self-help and took the law into his own hands, and before a court of equity could determine the rights of the parties he went upon Lot 8, which at the time he well knew belonged to appellant, and demolished the dwelling stipulated to be worth $5,000, thereby causing great destruction of property. He cannot now come into court, with unclean hands, and seek the equitable remedy of reimbursement for the amount he had enhanced the value of Lot 8 by the erection of the dwelling thereon. Bush v. Gaffney, Tex.Civ.App., 84 S.W.2d 759, 764; Sanders v. Cauley, 52 Tex.Civ.App. 261, 113 S.W. 560; Bollinger v. McMinn, 47 Tex.Civ.App. 89, 104 S.W. 1079; Primm v. White, 162 Mo.App. 594, 142 S.W. 802; Little v. Cunningham, 116 Mo.App. 545, 92 S.W. 734; Dean v. Elyton Land Co., 113 Ala. 276, 21 So. 213; Hall v. Wright, 9 Cir., 240 F.2d 787; Pomeroy's Equity Jurisprudence, 3rd Ed. § 404; 30 C.J.S. Equity § 95, p. 480; 10 R.C.L. 389, Equity, § 139; 19 Am.Jur. 323–325, Equity, §§ 469, 470.

■ Appellee seems to contend that appellant has unclean hands because it did not offer to pay appellee what it contended the dwelling was worth. In this appellee is mistaken. Appellant was not required to pay appellee anything until appellee had

secured a finding in a court of equity that Orts had constructed the dwelling in good faith and not as a result of his own negligence. Appellant had good reason to believe that such an issue might be decided in its favor, in which event it would owe appellee nothing, and, further, if it lost on this issue, appellant would have to pay only such sum as a jury, or other trier of the facts, might find appellee had enhanced the value of Lot 8 by the construction of the dwelling thereon. None of these matters had been decided or stipulated at the time Orts, as president of appellee, entered upon appellant's lot and demolished the dwelling he had built thereon, but which under the law belonged to appellant. Appellant is not here asserting an equitable remedy, it is suing in law for the damage that was wilfully done to its property by Orts, acting for appellee, but, even if appellant were seeking equitable relief, its failure to settle its claim upon Orts' terms, or any other terms, would not render its hands unclean. Commonwealth v. Filiatreau, 161 Ky. 434, 170 S.W. 1182; Plenderleith v. Glos, 329 Ill. 382, 160 N.E. 745.

The judgment of the trial court will be amended so as to permit appellant, Producers Lumber & Supply Company, Inc., to recover the sum of $5,000, the stipulated value of the dwelling demolished by Orts, and $300, found by the jury as exemplary damages, in addition to the sum of $600 awarded by the trial court, thus making the total amount of the judgment the sum of $5,900, and as thus amended the judgment will be affirmed. The cost of this appeal is adjudged against appellee.

BARROW, Justice (dissenting).

I do not concur in the opinion of the majority. My objection is that it allows the appellant to recover the sum of $5,000, the value of the house built by appellee on appellant's lot.

This is a damage suit brought by appellant, Producers Lumber & Supply Company, Inc., against appellee, Olney Build-

ing Company, wherein appellant sought to recover the sum of $5,000, the alleged value of the house torn down and removed by appellee, and the sum of $3,600, the alleged value of the lot, and exemplary damages in the sum of $5,000. Appellee answered by general denial and by special plea that it had built the house in question in good faith, in the mistaken belief that it was the owner of the lot; that the improvement enhanced the value of the lot to the extent of $5,000, and that before tearing it down and removing the house, it had sought to make an amicable settlement of the matter with appellant. The appellant will be referred to herein as Producers and appellee, as Olney.

The jury found in answer to Special Issue No. 1, that Olney built the house on Producers' lot acting in good faith, in the mistaken belief that it owned the lot, and that Olney was not negligent in so doing. The majority opinion intimates that it is doubtful if the jury's finding of good faith is justified in view of the fact that Producers' deed was on record. This intimation is unwarranted under the record in this case. The careful trial judge, in connection with the special issue, instructed the jury that to have acted in good faith Olney must have believed that it was the owner of said lot, "after having made such inquiry as a person of ordinary prudence would have made under the same or similar circumstances." The fact that appellant's deed was on record is only one of the evidentiary facts to be considered by the jury. The appellant did not contend in the trial court, nor does it contend in this Court, that the jury's finding of good faith is not fully supported by the evidence. The jury's finding, therefore, settles that argument.

The parties stipulated that the value of the house in question was $5,000, and that the improvement enhanced the value of the lot by the sum of $5,000. I find no fault with the majority opinion in allowing appellant $300, exemplary damages as found by the jury, and $600, found by the jury

as actual damages to the lot caused by the removal of the house.

There is no doubt that appellant is entitled to recover such damages as it suffered to its lot, which is all that it had at the inception of this transaction. Producers is also entitled to recover exemplary damages under the jury finding that the house was torn down and removed maliciously, but I cannot agree that it is entitled to recover compensatory damages for the removal of the house.

Regardless of what the law may be in other jurisdictions, it is well settled in this State, that a person who has in good faith made improvements upon the lands of another may obtain relief either in a suit in trespass to try title in an independent action for the purpose, *or in defense of a suit for removing the improvement.* Long v. Cude, 75 Tex. 225, 12 S.W. 827; Salazar v. Garcia, Tex.Civ.App., 232 S.W.2d 685; Mulholland v. Jolly, Tex.Civ.App., 17 S.W. 2d 1109; Murphy v. Benson, Tex.Civ.App., 245 S.W. 249; Mason v. Hood, Tex.Civ. App., 230 S.W. 468; Dean v. Dean, Tex. Civ.App., 214 S.W. 505; Wood v. Cahill, 21 Tex.Civ.App., 38, 50 S.W. 1071. It has also been held that a defendant in an action of trespass to try title may recover on equitable grounds, independently of the statutes, should his pleadings and proof warrant it, even though the plaintiff does not need or seek the aid of equity. Pomeroy v. Pearce, Tex.Com.App., 2 S.W.2d 431.

Appellant has cited no Texas authority which conflicts with the rules above stated, and no such case appears in the majority opinion. I have found no such authority in my own search. It is clear, under the authorities in this State, that such an improver does not lose his equitable rights by removing the improvements, but may urge in equity his defense in a suit for damages for the removal of the improvements. The right of the good faith improver to remove his property is also recognized. Authorities supra, also 1 Thompson on Real Property, 261, § 173. Section 174, on page 262,

cited by the majority, has no application for the reason that the matter there discussed does not involve a good faith improver.

In my opinion, the decision of this Court in Salazar v. Garcia, supra, opinion by Justice Broeter, and unqualifiedly approved by the Supreme Court by the outright refusal of a writ of error, is controlling. In that case Mrs. Garcia in good faith built her house on Salazar's lot in the mistaken belief that it was her lot. Salazar brought suit in trespass to try title, praying that he be declared the rightful owner of the lot, and that Mrs. Garcia and the holders of a lien for said improvements, Mr. and Mrs. Louis A. Hartung, be restrained from trespassing upon said lot or removing the improvements therefrom. Mrs. Garcia answered by plea of not guilty, by plea of improvements in good faith, and also pleaded that she had offered to do equity, in that she attempted without success to make a fair settlement of the controversy. The details of her efforts are set out in that opinion and are strikingly similar to the efforts of Olney in the instant case. The Hartungs pleaded that they had a first lien on the improvements and on Mrs. Garcia's lot to the extent of an indebtedness for said improvements, and asked that said lien be impressed upon Salazar's lot unless the court permitted or ordered the improvements moved to Mrs. Garcia's lot; and, in the alternative, that they be subrogated to the claims of Mrs. Garcia. The trial court found that Mrs. Garcia was a good faith improver and rendered judgment permanently enjoining Salazar from harming or damaging the improvements and ordering him to vacate within thirty days, granting Mrs. Garcia and the Hartungs the right to remove the improvements within ninety days with free ingress and egress to Salazar's lot for that purpose. The court denied Salazar any relief. This Court affirmed the judgment in an able opinion, except that it reformed the judgment by vesting the title and possession of the Salazar lots in him, subject to the rights of

Mrs. Garcia and the Hartungs. In its opinion, the Court held that the rights of a good faith improver are not based on any statute but on the principles of equity. The Court quoted the language used in Murphy v. Benson, supra [245 S.W. 254], wherein it was said: "We prefer to follow the authorities which hold that relief will be granted in equity to a party making improvements in good faith, by mistake, upon the land of another, either in suit of trespass to try title, or in an independent action for the purpose, or in defense of a suit for removing the improvements." This express language, spelling out the rights of a good faith improver, is also found in these cases: Long v. Cude, supra, by the Supreme Court, and the Murphy and Salazar cases, which were approved by the Supreme Court by the refusal of a writ. In Van Zandt v. Brantley, 16 Tex.Civ.App. 420, 42 S.W. 617, the Court held that the rule is based on the rule of natural justice, that no one should be enriched by the loss or injury of another.

In the majority opinion the statement is made, that if the building can be removed without great injury to the building or to the land, the court of equity may permit the improver to remove the building. The opinion cites Salazar v. Garcia, supra. That case makes no such holding. In fact, the opinion does not mention whether or not the house can be removed without damage thereto. In granting Mrs. Garcia ninety days in which to remove the house from Salazar's lot the Court did not even specify whether it was to be removed intact or be torn down and removed. I have found no authority which holds that the house must be moved as a whole or without any damage thereto. I think a court of equity in passing upon that question, if it did, would be governed by the type of house and the distance it is to be moved.

The majority opinion holds that Olney is not entitled to reimbursement for the amount its improvements enhanced the value of Producers' land because it resorted to "self-help," and took the law into its own hands, and demolished the building, causing great destruction of property, and by reason thereof Olney does not come into equity with clean hands, and therefore cannot seek equitable relief. I cannot agree with such reasoning. First, it is common knowledge that if Olney had a right to remove the building, which the authorities hold that it did, then if it became necessary to tear down the building in order to do so, it had that right, subject to its responsibility to pay for any damages to Producers' lot. Second, Olney does not seek any reimbursement, but only interposes its right in defense of Producers' suit for damages for the removal of the property. Third, the property "demolished," belonged to Olney and not to Producers. Fourth, had the house remained on Producers' lot, before it could claim the same it would have had to pay Olney the amount of the enhancement in value of its property. Fifth, it appears from the record that immediately upon discovery of the mistake, Olney contacted Producers and sought to adjust the difficulty. It first offered to buy the lot, and Producers asked $3,600 or $3,700 for the lot, although it cost $1,428. Producers' manager and witness Montgomery, testified the lot was worth $1,700 or $1,800. Olney then offered to trade any lot in the subdivision for Producers' lot. Producers declined on the ground that none of the lots would fit the plan of house that had been planned for its manager's home, although it was admitted that several of the lots offered were more valuable than Producers' lot. In that connection, it appears that the manager's home was not built on the lot in question, but was built on Walzen Road. Olney offered to sell the house to Producers either in its incomplete condition, or to complete it according to F.H.A. specifications at its cost. Producers declined and finally made a counter offer that it would give $7,000 for the house as so completed. The evidence shows that when completed the house would cost Olney $10,400. Montgomery testified that the completed house with the lot would be of the value of $12,000 to $12,900. When

Producers made the offer of $7,000 for the completed house, it notified Olney that it was its final offer, although, at the time Montgomery was instructed to make the offer, Producers' president told Montgomery that he would give $8,000 for the house. This was not communicated to Olney, they said: "Let's offer him $7,000.00." Producers never at any time offered to pay the amount of the stipulated enhancement of its lot. Thus the record shows that Producers, having Olney "at its mercy" attempted to drive an unconscionable bargain. It was at this point that Olney proceeded to tear down the house and remove it. In that connection, I have found no authority which makes any distinction between moving the improvements intact or tearing it down and removing it, so long as the land is not damaged.

I shall not lengthen this opinion by discussing the authorities cited, except the Texas cases, for the reason that I believe the law in Texas is well settled. The case of Luker v. Luker is not in point. In that case a son constructed improvements on his father's land, with the consent of the father, but without agreement as to the improvements. The case did not involve an improver in good faith under the mistaken belief that he owned the land. In Bonner v. Wiggins, 52 Tex. 125, cited in the majority opinion, the court had before it a trespass to try title suit which involved a boundary dispute, and was also for damages for breaking down a fence and carrying away the rails. The jury found for the defendants on the boundary question, but allowed the plaintiff, the improver, damages for the fence broken down and carried away. This was done under instructions that plaintiff, being the owner of the rails, and believing the land belonged to him, he placed them there in good faith, and they were carried away by authority of the defendants. The Court reversed and remanded the judgment, not on the ground that plaintiff was not entitled to compensation for the rails, but because there was no pleading to support the charge or the finding. The Court recognized, in the

opinion, the right of an improver in good faith to compensation, even where the owner of the land removed the improvements.

Bollinger v. McMinn, 47 Tex.Civ.App. 89, 104 S.W. 1079, is a case in which a landowner, McMinn, by mistake built a house on the boundary line and was in possession through a tenant. Bollinger, over the objection and protest of the tenant, sawed the house in two and removed three rooms, leaving a gallery and one room minus a wall. The Court held that McMinn could recover against Bollinger, although the part removed was on Bollinger's own land, and held that the measure of damages was the value of the house before the removal less its value thereafter.

Sanders v. Cauley, 52 Tex.Civ.App. 261, 113 S.W. 560, is not in point. The case involved a dispute between two factions in a school district over the location of a schoolhouse built by public subscription. The plaintiff wrongfully moved the schoolhouse off land which had been dedicated for that purpose, then sought an injunction to prevent patrons of the school from retaking and moving the house off the land where plaintiff had located it. The court held that, although the house was attached to plaintiff's land, it could not invoke the aid of equity to protect an advantage it had wrongfully obtained.

Bush v. Gaffney, Tex.Civ.App., 84 S.W. 2d 759, 764; is not in point, except as hereinafter stated. This was a case to set aside a deed on the grounds of fraud. The Court granted a rescission and a recovery of the purchase price, but disallowed exemplary damages to the defrauded purchaser.

It is my opinion, considering all the authorities in Texas, that when a person, acting in good faith without negligence, in the mistaken belief that he is the owner of the land, erects improvements on the land of another, he then has an equitable interest or estate in the land so improved to the extent of the amount his improvements enhances the value of the land so improved.

I also think the authorities are uniform in this State that he can protect his interest, estate or equity in either of the three ways above mentioned. It is also my opinion that he is not precluded from coming into equity by reason of doing what the courts have held he has a right to do.

Keeping in mind that appellant seeks to recover as damages the value of a house that it did not build and has not one dollar invested in, and that it seeks to recover such damages against appellee, which at its own expense built the house in question, I cannot in good conscience agree to such an inequitable decision. Appellant has sustained no injury so far as the house is concerned.

Damages has been defined as the pecuniary compensation, recompense or satisfaction for an injury sustained. 13 Tex.Jur. 68, Damages, § 2. "One who has suffered injury or damage is held to be entitled to recover, as nearly as possible, compensation for the loss or prejudice which he has suffered. The purpose of the law, in awarding actual damages, is to repair the wrong that has been done or to compensate for the injury inflicted, but not to impose a penalty; and the cardinal principle and only inflexible rule in this respect is that the person injured shall receive a compensation which is commensurate with his loss or injury, *and no more*." 13 Tex.Jur. 73, Damages, § 7. (Emphasis mine.)

Chief Justice Bickett, formerly of this Court, in Bush v. Gaffney, 84 S.W.2d 759, 764, said:

"It would ill comport with the principles of equity for the court to visit upon the defendants a sort of punishment to the pecuniary profit of the complainant and consequent loss of the defendants. A court of equity is a court of conscience, but not a forum of vengeance. It will make restitution, but not reprisals. It will fill full the measure of compensation, but will not overflow it with vindictive damages."

There is no sound reason to exact of appellee additional punitive damages in the sum of $5,000 and make the donation to appellant, as chastisement for appellee's alleged uncleanliness of hands, after full restitution has been made in awarding to appellant all damages which the jury found it suffered, as well as the exemplary damages found by the jury. Equity looks on that done which ought to be done.

As said by the Supreme Court in French v. Grenet, 57 Tex. 273, 279, in a situation similar to that involved here:

"In such case, the question is not whether a mistake of law shall vest title, but whether the penalty for that mistake, however innocently made and however diligently guarded against, shall be the forfeiture for a claim for improvements which enhanced the value of that property. To so decide would palpably violate that maxim, founded in the highest natural equity, that no one should be made richer to the damage and wrong of another."

I respectfully dissent.