269 F.2d 873
 Louis GAUDIOSI, Charles Schwartz, and Randolph Phillips, Individually and on Behalf of All Other Stockholders of the Pennsylvania Railroad Company Similarly Situated, Appellants,
v.
Richard K. MELLON, Robert T. McCracken, C. Jared Ingersoll, Walter S. Franklin, James E. Gowen, Philip R. Clarke, James M. Symes, John A. Diemand, John B. Hollister, Lammot duP. Copeland, Donald Danforth, R. George Rincliffe, William L. Day, Otto N. Frenzel, Fred Carpi, David C. Bevan, James P. Newell, Directors and
Pennsylvania Railroad Company, a Corporation, Incorporated Under the Laws of the Commonwealth of Pennsylvania, Appellees.
Louis GAUDIOSI, Charles Schwartz and Randolph Phillips, Individually and on Behalf of All Other Stockholders of the Pennsylvania Railroad Company Similarly Situated, Appellants
v.
Walter S. FRANKLIN, Richard K. Mellon, Robert T. McCracken, C. Jared Ingersoll, James E. Gowen, Philip R. Clarke, James M. Symes, John A. Diemand, John B. Hollister, Lammot duP. Copeland, Donald Danforth, R. George Rincliffe, William L. Day, Otto N. Frenzel, Fred Carpi, David C. Bevan, James P. Newell, Directors: Bayard H. Roberts and
Pennsylvania Railroad Company, a Corporation Incorporated Under the Laws of the Commonwealth of Pennsylvania, Appellees (five cases).
 No. 12618.
 Nos. 12742-12745.
 No. 12759.
 United States Court of Appeals Third Circuit.
 Argued January 19, 1959.
 Decided June 24, 1959.
 Rehearing Denied August 28, 1959.
 
 Randolph Phillips, New York City, pro se.
 Robert D. Abrahams, Philadelphia, Pa. (Abrahams & Loewenstein, Philadelphia, Pa., on the brief), for appellants Gaudiosi and Schwartz.
 Philip Price, Philadelphia, Pa. (Raymond W. Midgett, Jr., John J. Brennan, Barnes, Dechert, Price, Myers & Rhoads, Philadelphia, Pa., on the brief), for appellees.
 Before KALODNER and HASTIE, Circuit Judges, and EGAN, District Judge.
 KALODNER, Circuit Judge.
 
 
 1
 Two separate actions in the United States District Court for the Eastern District of Pennsylvania, arising out of a proxy contest for the election of six directors of the Pennsylvania Railroad Company ("Railroad") at its annual meeting on May 13, 1958, resulted in the six appeals now to be considered.
 
 
 2
 The first of the two actions (No. 24,456 below), was filed April 9, 1958, by Randolph Phillips, Louis Gaudiosi and Charles Schwartz,[1] citizens of New York, individually and in behalf of stockholders, against the Pennsylvania Railroad Company ("Railroad"), a Pennsylvania corporation having its principal office in Philadelphia, Pennsylvania, and its Directors, all citizens of states other than New York.
 
 
 3
 The complaint in this first action alleged multiple claims in four counts premised upon events which had occurred up until its filing in the campaign conducted for proxies by plaintiffs in behalf of Phillips' candidacy for director, and the Railroad for its six nominees.
 
 
 4
 It sought a declaratory judgment invalidating all proxies received by Railroad, an injunction against Railroad's solicitation of proxies in the manner pursued prior to the filing of the action and the use of Railroad's funds in solicitation of proxies, and a mandatory order that Railroad supply all stockholders with a ballot form of proxy and statement by Phillips refuting alleged false and misleading statements made by Railroad in letters earlier sent to stockholders.
 
 
 5
 On May 6, 1958, the Court below, following hearings, entered an Order[2] denying the relief sought by the plaintiffs, dismissing their complaint and entering judgment for the defendants with costs. Plaintiffs' appeal No. 12,618 arises out of the May 6, 1958 Order.
 
 
 6
 The second of the two actions (No. 24,654 below) was filed on May 9, 1958, by the plaintiffs against the defendants named in the first action and Bayard H. Roberts, secretary of Railroad. It, too, related to the proxy contest. It sought a declaratory judgment invalidating all proxies received by Railroad in support of its nominees, an injunction restraining Railroad's use of the proxies at the annual meeting at which six directors were to be elected, and postponement of the annual election until at least three weeks after the entry of a final order disposing of plaintiffs' request for relief.
 
 
 7
 In Count IV of their complaint plaintiffs pleaded a class action and asserted a derivative claim that the defendant directors were liable to Railroad for improper expenditures of corporate funds to promote the candidacies of management's six nominees for director, and sought an order requiring payment by the individual directors of all expenditures by Railroad in the proxy contest.
 
 
 8
 After filing this second complaint on May 9, 1958, plaintiffs, the same day, sought to amend it by adding as defendants Swiss banks which allegedly had 707,734 shares of common stock of Railroad registered in their names. In this fifth count plaintiffs sought an injunction restraining the Swiss banks from voting the stock mentioned at the May 13, 1958 annual election or executing proxies in favor of management nominees for directors. Copies of the amended complaint were served upon the Swiss banks on May 12, 1958. Subsequently, on June 10, 1958, this fifth count was dismissed on motions of the Swiss banks, by stipulation of the parties.
 
 
 9
 A hearing on plaintiff's motion for preliminary injunction scheduled to take place on May 13, 1958, the date of the election, was continued until May 19, 1958, and the annual election proceeded without restraint.
 
 
 10
 On May 19, 1958, upon agreement of the parties, the hearing was postponed until the judges of election had filed their report. On June 4, 1958, after the report had been filed, another hearing was held and the Court below entered a temporary restraining order serving to enjoin the management nominees from taking office pending disposition of the proceedings after final hearings which were concluded in July, 1958.
 
 
 11
 On August 5, 1958, the Court below entered an Order directing rehearing upon the class action claims embodied in Count IV of plaintiffs' complaint and for a separate trial of the claims. In an Opinion[3] accompanying the Order the Court below stated (166 F.Supp. at page 352) "* * * the plaintiffs have presented the representative claim in such haphazard fashion as to make it virtually impossible for the trial judge to make any just, proper determination."
 
 
 12
 On August 6, 1958, the Court below, pursuant to defendants' motion for an order requiring plaintiffs to furnish security for expenses, including attorneys' fees, incurred in connection with the proceedings relating to the class action claims in Count IV, entered an Order[4] directing plaintiffs to give such security in the sum of $3,000 on or before September 17, 1958. The Order directed the Clerk of the Court to mark the representative claim in the class action in Count IV dismissed in the event of failure to file the security specified. Developments with respect to this phase of the action will be discussed later.
 
 
 13
 On August 18, 1958, the Court below, complying with Rule 54(b), Federal Rules of Civil Procedure, 28 U.S.C., entered final judgment for the defendants on all of the several claims in plaintiffs' second action, except with respect to the class action claims in Count IV, reserved for trial in its prior order of August 5, 1958.[5] Unquestionably this judgment was immediately appealable.
 
 
 14
 However, on August 27, 1958, plaintiffs filed a motion, on its face denominated a motion pursuant to Rule 52(b), to amend particular findings of fact. The motion recited plaintiffs' desire to introduce new evidence on the particular factual issue and tendered supporting matter in the nature of new documentary evidence. Then, on September 16, 1958, with this motion pending before the Court below, the plaintiffs filed notices of appeal from the August 18th judgment which were subsequently docketed and are now before us as No. 12,742 and No. 12,743.
 
 
 15
 But a timely post judgment motion under Rule 52(b) deprives the judgment, for the time being at least, of its finality, and its immediate appealability. United States v. Crescent Amusement Co., 1944, 323 U.S. 173, 65 S.Ct. 254, 89 L.Ed. 160, rehearing denied 323 U.S. 818, 65 S.Ct. 437, 89 L.Ed. 650; cf. Continental Oil Co. v. United States, 1936, 299 U.S. 510, 57 S.Ct. 30, 81 L.Ed. 378; Aberlin v. Zisman, 1 Cir., 1957, 244 F.2d 620, certiorari denied 355 U.S. 857, 78 S.Ct. 84, 2 L.Ed.2d 63. As this Court stated in Healy v. Pennsylvania R. Co., 1950, 181 F.2d 934, 935:
 
 
 16
 "The District Court, when timely substantive motions are entertained and pending, has not lost jurisdiction, and it having the power to grant the motions, the judgment is not final for the purposes of appeal."
 
 
 17
 If this were all, the prematurity of the appeals at No. 12,742 and No. 12,743 would be clear. However, on September 29, 1958, the Court below denied the motion to amend its findings, ruling that it had no authority under that rule to make an amendment which could be justified only by matter outside the trial record. It is now argued that the motion was not in legal contemplation or effect a 52(b) motion and, therefore, that it did not affect the finality or appealability of the judgment. However, Rule 52(b) explicitly authorizes motions "not later than 10 days after entry of judgment * * * [to] amend its findings or make additional findings * * *." The instant motion was filed nine days after entry of judgment and it plainly asked for an amendment of the Court's findings. It was in fact and law a timely motion under Rule 52(b). It is true that the Court below found the motion without proper basis because it was predicated upon matter dehors the record.[6] But the pleading was still a request for relief under Rule 52(b) and as such it suspended the appealability of the judgment until September 27, 1958, when the motion was denied.
 
 
 18
 Thereafter, on October 9, 1958, appeals were again taken from the original judgment at No. 12,744 and No. 12,745. These were timely and proper. Under Rule 73(a) "the full time for appeal [30 days] * * * commences to run and is to be computed from the entry of [an] order * * * denying a [timely] motion under Rule 52(b) to amend or make additional findings of fact." Here appeals were taken within two weeks after denial of the timely motion for relief under Rule 52(b). There is no substance to defendants' argument that the invalid appeal taken while the Rule 52(b) motion was pending below, nevertheless incapacitated the trial court from disposing of that pending motion. The premature appeal was legally a nullity. United States v. Crescent Amusement Co., supra, 323 U.S. at pages 177-178, 65 S.Ct. 257.
 
 
 19
 It follows that the appeals at No. 12,742 and No. 12,743 must be dismissed as premature and ineffectual. The appeals at No. 12,744 and No. 12,745 are entitled to consideration on their merits.
 
 
 20
 Before such consideration is given, the case history of still another of these appeals, No. 12,759, must be stated. This appeal relates to that facet of this complex litigation concerned with the class action claims in Count IV and the District Court's Order of August 6, 1958 directing plaintiffs' giving of security for expenses, including attorneys' costs, earlier recited. The August 6th Order directed the Clerk of the Court to dismiss the Count IV class action unless the security was entered on or before September 17, 1958. It appears that on August 27, 1958 plaintiffs served interrogatories on Railroad purporting to relate to the class action claims. On September 5, 1958, Railroad filed objections to the interrogatories, one of which was premised on the ground that the interrogatories were premature since plaintiffs had not complied with the Order of August 6, 1958 to post "security for expenses" by September 17, 1958 under penalty of dismissal. In an apparent effort to meet this objection, one of the plaintiffs, Gaudiosi, on September 10, 1958 filed a bond for "costs" in the sum of $3,000. The bond bore the signature of a surety company only.
 
 
 21
 On October 21, 1958 the Court below held an unreported hearing in chambers on defendants' objections to plaintiffs' interrogatories. Defendants urged that in filing the bond for "costs" only on September 10, 1958 plaintiffs had not complied with the Court's Order of August 6, 1958 which provided "that plaintiffs shall give security in the sum of $3,000 for any reasonable expenses, including attorneys' fees, which may be incurred by The Pennsylvania Railroad Company, * * *" The Court below subscribed to defendants' contention in this respect and later in the day entered an Order sustaining their objections to the interrogatories "because of plaintiffs' noncompliance with the order of this Court dated August 6, 1958."
 
 
 22
 The next day — October 22, 1958 — the Clerk of the District Court, pursuant to defendants' praecipe filed that day, dismissed the representative claim in the class action in Count IV, "for failure of plaintiffs to comply with said order [August 6, 1958] of the Court." Plaintiffs appealed from this dismissal on October 28, 1958 — Appeal No. 12,759.
 
 
 23
 The foregoing brings us to consideration of the appeals which require disposition, namely, Appeal No. 12,618 — from the dismissal of plaintiffs' first action on May 8, 1958; Appeals No. 12,744 and 12,745 — from the entry of judgment for defendants on August 18, 1958 in plaintiffs' second action, and Appeal No. 12,759 — from the dismissal on October 22, 1958 of the class action claim in Count IV.
 
 
 24
 We shall first consider Appeal No. 12,759.
 
 
 25
 With respect to that appeal plaintiffs make three main contentions: (1) the District Court (via its clerk) had no jurisdiction on October 22, 1958 to dismiss the class action claim in Count IV because its Order of August 18, 1958, reserving for trial that claim — in accordance with its prior Order of August 5, 1958 — had been earlier appealed; (2) the Pennsylvania statute requiring security for costs is unconstitutional, and (3) the District Court abused its discretion in (a) erroneously delaying final judgment on the class action claim in Count IV in its Orders of August 5 and 18, 1958; (b) unreasonably fixing $3,000 "security for expenses" in its Order of August 6, 1958, and (c) ruling the bond posted for "costs" as non-compliance with the August 6, 1958 Order.
 
 
 26
 Plaintiffs' contentions can be described as nothing less than specious. As to the first — the record discloses that the District Court exercised sound discretion when in compliance with Rule 54(b) it directed final judgment on all issues in plaintiffs' second action and reserved for further trial the class action claim in Count IV. By reason of that reservation there was no final appealable judgment as to it, and, it was not within the periphery of Appeals No. 12,744 and No. 12,745.
 
 
 27
 Plaintiffs' contention that the Pennsylvania statute providing for security for expenses in derivative actions is unconstitutional ignores our implicit holding to the contrary in Knapp v. Bankers Securities Corporation, 3 Cir., 1956, 230 F.2d 717 and Murdock v. Follansbee Steel Corp., 3 Cir., 1954, 213 F.2d 570.
 
 
 28
 Finally, we can discern no possible basis for holding that the District Court abused its discretion in fixing $3,000 "security for expenses" in its Order of August 6, 1958 or in ruling, in its Order of October 21, 1958, that the $3,000 "costs" bond filed by Gaudiosi — one of the plaintiffs — was not in compliance with the August 6, 1958 Order to file "security for expenses".
 
 
 29
 For the reasons stated the Order of October 22, 1958 dismissing the class action claim in Count IV will be affirmed in Appeal No. 12,759.
 
 
 30
 For reasons later stated, we will consider together the remaining appeals — No. 12,618 from dismissal of plaintiffs' first action on May 6, 1958 and Nos. 12,744-45 from entry of judgment for defendants on August 18, 1958, in plaintiffs' second action.
 
 
 31
 Both actions sought equitable relief in the proxy contest for the office of director of Railroad, in which plaintiffs sought to break Railroad management's slate of six nominees by electing Phillips. The specific relief sought by plaintiffs in the two actions was earlier stated. Broadly stated, in each, plaintiffs assailed as illegal and inequitable defendants' conduct in the proxy contest and sought to invalidate management proxies received and later cast in support of its six nominees at the May 13, 1958 annual meeting. Further, in both actions, plaintiffs complained that defendants had unlawfully denied rights which allegedly inured to them in the proxy contest, and sought injunctions to enforce them.
 
 
 32
 The District Court's opinion in the second action, reported at E.D.Pa.1958, 166 F.Supp. 353 contains a detailed recital, in its Findings of Fact, of the complex sequence of events in the proxy contest on which plaintiffs sought to premise both of their actions.
 
 
 33
 In its Findings of Fact, some ultimate in nature, the District Court found that the defendants had not, in any respect, in their conduct of the proxy contest, either committed the unlawful and inequitable acts alleged by the plaintiffs or denied to them their legal and equitable rights, and that, on the other hand, Phillips had "deliberately and maliciously" in violation of the applicable rules of the Securities and Exchange Commission, in the course of the proxy contest, sought to "intimidate" registered owners of some 800,000 shares of Pennsylvania Railroad Company stock to the end that they would not execute management proxies or vote their stock for management nominees.[7] Based on these fact-findings, the District Court, in paragraph 26 of its Conclusions of Law, ruled that "In this action Phillips came into equity with unclean hands", and in paragraph 27, that "Phillips' unclean hands bar the grant to Phillips of any equitable relief."
 
 
 34
 On review of the record we are of the opinion that it amply sustains the District Court's fact-findings and Conclusions of Law with respect to Phillips' "unclean hands" and that its Order of August 18, 1958, entering judgment for defendants, except as to the representative claim in the class action embodied in Count IV of their second action, should be affirmed.
 
 
 35
 It appears that during the proxy contest the New York Times published a news account stating, in substance, that the Swiss Bankers Association had urged its member banks to vote in favor of management whenever they voted proxies on behalf of stockholders in American corporations and that Phillips had knowledge of this account prior to April 30, 1958.
 
 
 36
 It further appears that on April 30, 1958, Credit Suisse, a Swiss bank, was the registered owner of 362,156 shares of Railroad stock and that the Swiss Bank Corporation, another Swiss bank, was the registered owner of 444,657 shares of the same stock. At the time mentioned Phillips was of the belief that the two Swiss banks were each the registered or beneficial owners of approximately 361,000 shares of Railroad stock, and that they had executed and intended to deliver to Railroad proxies to vote in favor of the six management nominees for director.
 
 
 37
 On April 30, 1958, without prior submission to the Securities and Exchange Commission for "clearance", as required by Rule X-14-A-1, et seq. of the Securities and Exchange Act, Phillips sent to the two Swiss banks identical telegrams as follows:
 
 
 38
 "I understand that your Bank which is the nominee for 360,918 shares of Pennsylvania Railroad Co. capital stock intends to vote said stock for the 6 management nominees for director at the Railroad's annual election to be held on May 13, 1958, without informing the owners of said stock of the contest for directors now existing and without giving them an opportunity to determine for themselves whether or not their stock should be voted and without giving them an opportunity to vote for myself as the 1 non-management nominee for director, or for the 6 management nominees, or for 5 or less of the management nominees and the 1 non-management nominee. Such arbitrary and undemocratic action by your Bank not only violates American equitable and common law principles applicable to banks when they act as fiduciaries but also violates the rules of the Securities and Exchange Commission and New York Stock Exchange as well as American banking practices applicable to all stock exchange brokers and banks in this country. It is a violation of the concept of a free and fair election on a fully informed basis, it constitutes a fraud upon the stockholders, and can only be of comfort to dictators and totalitarians in or out of corporation management.
 
 
 39
 "Such action by your Bank also constitutes a combination with the Pennsylvania Railroad management and other company managements that is prohibited under the antitrust laws of this country and which are applicable to your Bank since it is doing business in the United States.
 
 
 40
 "Such improper practices which already have been criticised in the United States Senate threaten to damage immeasurably myself and many thousands of associated stockholders. Unless you give me prompt assurance of the immediate termination of these practices I will reluctantly be compelled to take prompt and appropriate legal action in the courts. Kindly advise me by return wire of your answer to this telegram."
 
 
 41
 When authorized officials of the Securities and Exchange Commission discovered the transmission of the foregoing telegrams without prior submission to the Commission, they directed Phillips to file copies of them as "soliciting material". Upon his submission of the copies, under protest, on May 9, 1958, the Commission's staff expressed its disapproval and Phillips, either in anticipation of or as a result of it, sent the following telegram to each of the banks:
 
 
 42
 "I hereby withdraw all statements in my telegram to you dated April 30, 1958 except the first sentence, and I hereby substitute in place of said withdrawn statement the statement that `If said stock is voted by your Bank I reserve all rights in law and equity to take legal and other appropriate action against you for just and equitable relief'".
 
 
 43
 For eight years preceding 1958 the two Swiss banks had sent in their proxies to management for virtually the entire number of shares held by them. However, at the election on May 13, 1958 they together voted approximately only 100,000 shares as to which they had specific instructions from the beneficial owners. They withheld the remaining 700,000 shares, as found by the District Court, as the direct result of the receipt of Phillips' telegram of April 30, 1958.
 
 
 44
 That that is so is made manifest by these circumstances: the so-called "withdrawal" telegrams of May 9th specifically contained the threat that if the stock of the Swiss banks was voted for management nominees Phillips reserved "all rights in law and equity to take legal and other appropriate action" against the banks; Phillips the very day that the telegrams were sent filed an amendment to his second complaint by adding the Swiss banks as defendants and copies of the amended complaint were served on the Swiss banks on May 12, 1958; and May 9th, the day the telegrams were sent, was Friday and the week-end intervened between that day and Tuesday, May 13th when the annual meeting took place.
 
 
 45
 The foregoing negatives Phillips' contention that the telegrams of May 9th had "righted" any wrongs committed by him in his April 30th telegrams.
 
 
 46
 We do not need to dwell further on the District Court's findings of "unclean hands" on Phillips' part except to say that his dire threats to the Swiss banks in his April 30th telegrams of possible anti-trust action, and his invocation of the spectres of "fraud", "violation of American equitable and common law principles applicable to banks", violation of "the rules of the Securities and Exchange Commission and New York Stock Exchange as well as American banking practices applicable to all stock exchange brokers and banks in this country" amply supported the District Court's fact-finding of "deliberate and malicious" wrongdoing with intent to "intimidate" in violation of the Rules of the Securities and Exchange Commission in proxy contests.
 
 
 47
 Clearly Phillips' conduct constituted the "unclean hands" which barred his prayers for equitable relief.
 
 
 48
 The bar of "unclean hands" extends to plaintiffs' first action although it was not there considered in the District Court's disposition of it, and was not raised by defendants.
 
 
 49
 It will be recalled that plaintiffs' first action was dismissed on May 6, 1958. Phillips' telegrams to the Swiss banks on April 30, 1958 preceded that dismissal. Plaintiffs appeal from that dismissal is before us in Appeal No. 12,618.
 
 These principles are well-settled:
 
 50
 One who comes into equity must come with clean hands and keep those hands clean throughout the pendency of the litigation even to the time of ultimate disposition by an appellate court.[8]
 
 
 51
 Courts are concerned primarily with their own integrity in the application of the clean hands maxim and even though not raised by the parties the court will of its own motion apply it.[9]
 
 
 52
 The clean hands maxim gives wide sweep to the equity court's exercise of discretion "in refusing to aid the unclean litigant."[10]
 
 
 53
 The equity court "is not bound by formula or restrained by any limitation that tends to trammel the free and just exercise of discretion."[11]
 
 
 54
 The principles stated are dispositive with respect to plaintiff's first and second actions, although, as previously stated, the issue of "unclean hands" was not raised by defendants or considered by the District Court in the first action as it was in the second action. The April 30, 1958 telegrams to the Swiss banks tainted the first action to the same extent that it did the second. The District Court properly exercised its discretion in applying the "unclean hands" maxim in denying relief to plaintiffs in the second action. The fact that it did not invoke the maxim in its disposition of the first action is immaterial. We can and must do so here under the cases cited.
 
 
 55
 As we stated in Root Refining Co. v. Universal Oil Products Co., 3 Cir., 1948, 169 F.2d 514, 534, 535, certiorari denied Universal Oil Products Co. v. William Whitman Co., 335 U.S. 912, 69 S.Ct. 481, 93 L.Ed. 444, rehearing denied 336 U.S. 915, 69 S.Ct. 601, 93 L.Ed. 1079:
 
 
 56
 "* * * No principle is better settled than the maxim that he who comes into equity must come with clean hands and keep them clean throughout the course of the litigation, and that if he violates this rule, he must be denied all relief whatever may have been the merits of his claim. * * *"
 
 
 57
 Plaintiffs' contention that defendants were not "injured" by reason of the sending of the April 30, 1958 telegrams is irrelevant to the issue. As Judge Learned Hand in his dissenting opinion in Art Metal Works v. Abraham & Straus, 2 Cir., 1934, 70 F.2d 641, at page 646, certiorari denied 293 U.S. 596, 55 S.Ct. 110, 79 L.Ed. 689, so aptly stated:
 
 
 58
 "The doctrine [of unclean hands] is confessedly derived from the unwillingness of a court, originally and still nominally one of conscience, to give its peculiar relief to a suitor who in the very controversy has so conducted himself as to shock the moral sensibilities of the judge. It has nothing to do with the rights or liabilities of the parties; indeed the defendant who invokes it need not be damaged, and the court may even raise it sua sponte. * * *" (Emphasis supplied.)
 
 
 59
 There remains for disposition Phillips' contention that "the maxim of `unclean hands' does not dispose of the rights of others", and that "neither plaintiffs Gaudiosi or Schwartz participated in these acts of Phillips, thus the defense is totally inapplicable to them, as well as to the 23,000, or less, stockholders upon whose behalf all three plaintiffs sued."
 
 
 60
 The contention is utterly without merit. It ignores the earlier cited principle that courts are concerned primarily with their own integrity in the application of the clean hands maxim. Courts in such situations act for their own protection and not as a matter of "defense" to the defendant. Public policy not only makes it obligatory for courts to deny a plaintiff relief once his "unclean hands" are established but to refuse to even hear a case under such circumstances. Thus it has been held that even in a stockholders' derivative action "unclean hands" on the part of a plaintiff will require dismissal of the action.[12]
 
 
 61
 Apart from the foregoing, to subscribe to this last contention would require us to ignore the fact that plaintiffs' two actions (apart from the derivative claim in Count IV) were specifically instituted to further Phillips' candidacy for director. The startling result would be to permit Phillips to eat his apple with "unclean hands". Justice may be blind but it isn't "dumb".
 
 
 62
 For the reasons earlier stated the appeals in Nos. 12,742 and 12,743 will be dismissed and the Orders in appeals Nos. 12,618, 12,744, 12,745 and 12,759 will be affirmed.
 
 
 
 Notes:
 
 
 [1]
 Phillips, Gaudiosi and Schwartz at the time of the filing of the first action were beneficial owners respectively of 500, 1,400 and 500 shares of the common stock of the Pennsylvania Railroad Company
 
 
 [2]
 Findings of Fact and Conclusions of Law by the District Court accompanied its Order of May 6, 1958. They are unreported
 
 
 [3]
 Gaudiosi v. Franklin, D.C.E.D.Pa.1958, 166 F.Supp. 351
 
 
 [4]
 In its "Memorandum Re Security for Expenses", unreported, the Court below noted that the Pennsylvania Statute, 12 P.S. §§ 1321-1323 required security in any suit instituted by the holders of less than 5% of the outstanding shares of any class of a corporation's stock, and that the plaintiffs owned only approximately .00018 per cent of the Pennsylvania Railroad Company's stock
 
 
 [5]
 The District Court's Findings of Fact and Conclusions of Law, accompanying its Order of August 18, 1958, are reported at D.C.E.D.Pa.1958, 166 F.Supp. 353. The Order vacated an outstanding restraining order (dated June 4, 1958), denied all of plaintiffs' claims for relief except with respect to the class action claims in Count IV and directed entry of judgment, with costs, in favor of defendants, on all issues except with respect to the class action claims
 
 
 [6]
 The brief Memorandum supporting the denial of the motion stated:
 "* * * An examination of the motion discloses that the request to amend finding of fact No. 9 is not predicated upon the trial record upon which the adjudication filed August 18, 1958 was founded. Instead the present motion requests the court to consider as evidence certain exhibits attached to the motion which were never identified or offered in evidence during the trial and form no part of the trial record. The obvious purport of the motion is to request the court to permit bills which were never a part of the trial record to be offered exparte by this plaintiff long after the trial was concluded and subsequent to the adjudication by the court. As we view it the end sought by the present motion is not properly within the scope of Rule 52(b)."
 
 
 [7]
 Findings of Fact Nos. 52-66, inclusive, 166 F.Supp. 367, 368, 369
 
 
 [8]
 Hazel-Atlas Glass Co. v. Hartford Empire Co., 1944, 322 U.S. 238, 250, 64 S. Ct. 997, 88 L.Ed. 1250
 
 
 [9]
 Hall v. Wright, 9 Cir., 1957, 240 F.2d 787, 795; Frank Adam Electric Co. v. Westinghouse Elec. & Mfg. Co., 8 Cir., 1945, 146 F.2d 165, 167
 
 
 [10]
 Precision Instrument Mfg. Co. v. Automotive Maintenance Machinery Co., 1945, 324 U.S. 806, 815, 65 S.Ct. 993, 89 L.Ed. 1381
 
 
 [11]
 Keystone Driller Co. v. General Excavator Co., 1933, 290 U.S. 240, 245, 54 S. Ct. 146, 78 L.Ed. 293; Bishop v. Bishop, 3 Cir., 1958, 257 F.2d 495, 500
 
 
 [12]
 Rosenfeld v. Zimmer, 1953, 116 Cal.App.2d 719, 254 P.2d 137, 139