

1999 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

7-7-1999

# In Re: New Valley

Precedential or Non-Precedential:

Docket 98-6267

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1999

Recommended Citation

"In Re: New Valley" (1999). *1999 Decisions.* Paper 192.
http://digitalcommons.law.villanova.edu/thirdcircuit_1999/192

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1999 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed July 6, 1999

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 98-6267

IN RE: NEW VALLEY CORPORATION,

      Debtor

NEW VALLEY CORPORATION, c/o BROOKE GROUP LTD.

v.

CORPORATE PROPERTY ASSOCIATES 2 AND 3,
c/o W.P. CAREY & COMPANY, INC.

Corporate Property Associates 2 and 3,

      Appellants

On Appeal from the United States District Court
for the District of New Jersey
(D.C. No. 98-cv-00982)
District Judge: Honorable Alfred M. Wolin

Argued Friday, May 21, 1999

BEFORE: McKEE, RENDELL and GARTH, Circuit Judges

(Opinion filed July 6, 1999)

        W. Thomas McGough, Jr. (Argued)
        James M. Doerfler
        Reed Smith Shaw & McClay, L.L.P.
        435 Sixth Avenue
        Pittsburgh, PA 15219-1886

        Attorneys for Appellants
        Corporate Property Associates
        2 and 3

David M. Friedman
Lorie R. Beers (Argued)
Howard W. Schub
Kasowitz, Benson, Torres
 & Friedman LLP
1301 Avenue of the Americas
New York, New York 10019

Attorneys for Appellee
New Valley Corporation

OPINION OF THE COURT

GARTH, Circuit Judge:

This appeal presents us with the question of whether the doctrine of unclean hands can be applied to deny relief to a landlord-creditor when the Bankruptcy Court has held the landlord-creditor's Proofs of Claim were not related to the events giving rise to the assertion of unclean hands.

In this case, the Bankruptcy Court held that the alleged "unclean hands" did not bar the claims for relief sought by the landlord-creditor, Corporate Property Associates ("CPA"). The District Court for the District of New Jersey reversed that determination and denied all relief to CPA.

We agree with the Bankruptcy Court that the challenged actions taken by CPA did not relate to the matters for which CPA sought payments under its leases, and that the Proofs of Claim filed by CPA did no more than reserve CPA's rights, which were controverted by the lessee, New Valley Corporation ("New Valley"). Accordingly, we will reverse the district court's Order dated July 13, 1998, denying relief to CPA, and remand to the district court so that it may resolve the remaining issues raised by the parties in their respective appeals to the district court.

I.

The district court had appellate jurisdiction over the final order of the Bankruptcy Court, dated January 26, 1998

2

which followed from its opinion of December 23, 1997, pursuant to 28 U.S.C. S 158(a).

This Court has jurisdiction under 28 U.S.C. S 158(d) and 28 U.S.C. S 1291 over the final order of the district court, dated July 13, 1998, which dismissed the claims of CPA against New Valley. CPA filed a timely Notice of Appeal on August 11, 1998.

II.

In November, 1981, CPA1 purchased properties in Reno, Nevada; Moorestown, New Jersey and Bridgeton, Missouri, from the Western Union Realty Corporation. The Western Union Telegraph Company had been the tenant of the properties, which had been owned by Western Union Realty Corporation.

In December 1981, Western Union Telegraph Company changed its name to Western Union Corporation ("WUC"). WUC continued to be the tenant of record of the properties. In August, 1989, Western Union Financial Services, Inc. (formerly a division of WUC) ("FSI") was spun off as a wholly-owned corporate subsidiary. Two years later, in April, 1991, WUC changed its name to New Valley Corporation.

On March 15, 1990, Donald Wasson, Director of Real Estate Operations for New Valley,2 faxed proposed "Consent to Assignment" forms (the "Consents") to Barclay Jones, then Vice President of CPA.3 The cover letter to the proposed consent forms stated that as a result of Western Union's corporate restructuring, New Valley wished "to assign its lease[s]" to FSI for the Bridgeton and Reno properties. The proposed Consents concerned only the Bridgeton and Reno properties. No attempt was made by

_____

1. There are actually two entities involved as appellees, CPA 2 and CPA 3, which will be referred to collectively as "CPA."

2. Although, as indicated, WUC did not change its name until April 1991, "New Valley" will be used throughout in the interest of clarity.

3. CPA's brief identifies Jones as Vice President of CPA's "general partner." Because no further identification of CPA's general partner appears in the record, we refer to Jones as CPA's Vice President.

3

New Valley to assign the Moorestown, New Jersey lease. New Valley asked that CPA execute the Consents.

CPA took no immediate action on the two proposed Consents. About a month later, however, Wasson and Jones had a telephone conversation in which Jones stated that CPA would not agree to any assignments unless the Moorestown lease was also assigned by New Valley to FSI. Wasson replied that New Valley did not want to assign the Moorestown lease, as a decision had already been made by New Valley to abandon Moorestown. FSI had already been operating out of the Bridgeton and Reno properties, whereas New Valley had already moved much of its operation out of Moorestown. Wasson confirmed his impression that CPA had not agreed to the assignment of the Bridgeton and Reno leases in an internal April 12, 1990 memorandum. Jones testified at trial that there had been no meeting of the minds with regard to the assignments of the leases.

No discussions were held between the parties on the issue of the assignments until May, 1993. On May 18, 1993, CPA faxed to New Valley what were purported to be executed "Consent to Assignment" forms for the Bridgeton and Reno leases. New Valley was already in bankruptcy by that date. In a letter from New Valley to CPA's counsel, dated September 8, 1993, New Valley stated that it "flatly dispute[d]" CPA's execution of the proposed Consents. New Valley had no record of the fully executed "Consent to Assignment" forms in its files. CPA responded with a letter on September 30, 1993, stating that New Valley's position reflected only a "creative bankruptcy solution" that was intended to shield FSI from liability.

On October 4, 1993, John C. Walters, a Senior Vice President of New Valley, sent a letter to CPA in order to clarify the situation involving the Bridgeton and Reno leases. The letter stated that "[w]hile FSI admittedly has operated out of the Bridgeton and Reno sites since it became operational in 1990, it has done so pursuant to an agreement with New Valley . . . which obligates FSI to reimburse New Valley for its pro rata share of the expenses. . . ." Walters noted that New Valley had wanted to assign

4

the leases to FSI in 1990, but that it believed it could not do so without CPA's approval.

The Consents that were forwarded by CPA on May 18, 1993, had been signed on behalf of CPA by Jones, but they were dated April 15, 1990. Jones was named as "Executive Vice President," a title that he in fact did not attain until approximately a year after the purported execution date. The date the Consents were executed, April 15, 1990, also happened to be the date of Easter Sunday. New Valley at trial presented evidence that the Consents could not have been executed on April 15, 1990, and the Bankruptcy Court credited this evidence. At trial, Jones testified that although he recalled signing the Consents, he could not recall whether he signed them on Easter Sunday, 1990.

In addition, there was evidence that, even after the purported date of the assignments (April 15, 1990), CPA was aware that New Valley in fact remained the tenant of Bridgeton and Reno. For example, Jones testified that, in September 1991, CPA sent a letter to New Valley announcing a rent increase. Further, CPA accountants requested information from New Valley in December 1991 and again in December 1994 relating to the tenancy of Bridgeton and Reno.

III.

The instant litigation commenced on November 15, 1991, when an involuntary Chapter 11 petition was filed against New Valley. New Valley consented to an entry of an order for relief under Chapter 11 on March 30, 1993.

In April, 1993, New Valley moved before the Bankruptcy Court to reject the Moorestown lease. At about the same time, New Valley moved to extend the deadline to assess whether to reject the leases for Bridgeton and Reno. On May 24, 1993, the Bankruptcy Court approved the rejection of the Moorestown lease. Although initially CPA objected to the extension of the deadline sought by New Valley, it withdrew its objection because, it alleged, these leases [Bridgeton and Reno] may have been assigned to FSI.

As earlier mentioned, on May 18, 1993, in support of its argument that the Bridgeton and Reno leases had been

5

assigned to FSI, CPA faxed copies of what were purported to be fully executed "Consent to Assignment" forms for those leases. On September 8, 1993, New Valley wrote to CPA and stated that it was New Valley's understanding that the leases had not been assigned. In its September 30, 1993 letter, CPA implied that whether the leases had been assigned informally or de facto was a question best resolved through litigation.

Also on September 30, 1993, CPA filed its first Proof of Claim with the Bankruptcy Court. With respect to the Bridgeton and Reno leases, CPA contended that

> [a]lthough the [Bridgeton and Reno] leases were assigned and assumed by [FSI], a non-debtor subsidiary of [New Valley], because [New Valley] has taken the position in this bankruptcy case that the two leases were not assigned, [CPA] ha[s] included these amounts in its Proof of Claim as a precautionary measure. [CPA] hereby reserve[s] the right to argue that the Bridgeton and Reno leases were in fact assigned to and assumed by FSI.

CPA included an almost identical reservation of rights in its second Proof of Claim, which was filed on January 20, 1995. This second Proof of Claim was concerned only with Reno, and was evidently filed to reflect additional information. The Bankruptcy Court approved New Valley's rejection of the Reno lease in December 1994.

After extensive discovery and briefing, the Bankruptcy Court resolved some rental issues in an order dated October 29, 1996, on the parties' cross-motions for summary judgment on New Valley's objections to the Proofs of Claim. Those matters not resolved on motions proceeded to trial on issues relating only to the Reno and Moorestown properties. CPA's claims concerning Bridgeton had been settled before trial, and CPA's claims regarding Bridgeton were withdrawn with prejudice in June, 1997.

The trial, which was held in July, 1997, took eight days to complete. The Bankruptcy Court determined that CPA's statements in its Proofs of Claim -- and its similar statements in January 1996 in a response to New Valley's Request for Admissions and Interrogatories -- did not

6

constitute admissions by CPA of its belief that the leases
had been assigned. Rather, the Bankruptcy Court held that
CPA did not have sufficient information to determine
whether the leases had been assigned or not.

On December 23, 1997, the Bankruptcy Court issued an
opinion in favor of CPA. The Bankruptcy Court, after
deducting certain amounts from CPA's claims, awarded
CPA a total of $2,888,469.30 in unpaid rent and other costs.[4]
Approximately $824,000.00 of this amount was attributable
to the Reno lease, and the remainder ($2,056,469.30) was
attributable to the Moorestown lease.[5]

The Bankruptcy Court explicitly found that CPA's
conduct regarding the assignments of the Bridgeton and
Reno leases did not merit disallowance of its claims.
Although the Bankruptcy Court was "wholly unconvinced"
that CPA actually believed that the Bridgeton and Reno
leases had been assigned, nevertheless it found "no impact
on the proofs of claim . . . since the alleged assignments did
not bear on any element of the proof[s] of claim. Without
more, they are not sufficient circumstantial evidence that
CPA concocted an inflated claim. Rather, it appears to have
been a somewhat misguided effort to preserve a right
against FSI in the event CPA was unlikely to be paid in the
New Valley case."[6] Further, the Bankruptcy Court agreed
with New Valley that it was "likely that the Consents were
backdated and then produced to avoid the prospect of being
limited to a lease rejection claim in the New Valley
bankruptcy."[7]

The Bankruptcy Court concluded that CPA's conduct
with regard to a claim against FSI arising out of the alleged
assignments, was not dispositive of its claims against New

_____

4. CPA had claimed a total due from New Valley of $3,499,084.84.

5. We note that these figures, employed by CPA in its brief, add up to
$2,880,469.30, while the Bankruptcy Court, as noted in text, awarded
CPA a total of $2,888,469.30. This discrepancy is not explained by the
parties. The discrepancy, however, does not affect our disposition of this
appeal.

6. Bankruptcy Court Op. at 41.

7. Id. at 25.

7

Valley. "If the court had before it an objection by FSI to a CPA claim the issues surrounding execution of the Consents would be directly pertinent." However, as the claims at issue were against New Valley, and not FSI, CPA's conduct did not warrant having its claims disallowed.

Both parties appealed to the District Court for the District of New Jersey. While both raised a number of issues, the district court ruled only on the issue of unclean hands, raised by New Valley. The other issues, it decided, were rendered moot by its decision.[8]

The district court reversed the Bankruptcy Court's determination on the grounds that the Bankruptcy Court had "abused its discretion . . . because [it] applied the wrong legal principle." The district court did not dispute that the Bankruptcy Court did in fact have discretion to refuse to apply the unclean hands doctrine.

Specifically, the district court, relying upon Gaudiosi v. Mellon, 269 F.2d 873 (3d Cir.), cert. denied, 361 U.S. 902 (1959), concluded that the Bankruptcy Court, by failing to apply the unclean hands doctrine, did not follow the law of this Circuit. Rather, the district court concluded that the doctrine of unclean hands should be applied to protect the integrity of the court itself, regardless of whether the unclean hands of a creditor injured a party and regardless

_____

8. In addition to the issue of unclean hands, New Valley appealed the Bankruptcy Court's evidentiary ruling regarding CPA's alleged admissions, and its ruling that CPA's claim for rent for the Moorestown property was not subject to 11 U.S.C. S 502(b)(6)'s mandatory cap.

CPA appealed 1) the ruling of the Bankruptcy Court that its deferred maintenance costs were capped under section 502(b)(6); 2) the calculation of the section 502(b)(6) cap; 3) the determination of the reasonable rental rate for Moorestown; 4) the exclusion of CPA's claim for the cost of retaining maintenance; and 5) the Bankruptcy Court's determination of the effective rejection date for the Moorestown lease.

Because the district court held that all of CPA's claims were barred by CPA's "unclean hands," it did not reach or decide the appeals taken with regard to the other issues decided by the Bankruptcy Court. We have no occasion to address those issues either, as the only question before us is whether the district court erred in holding that CPA's unclean hands barred it from relief.

8

of the presence of any immediate and necessary relationship between the claims before the court and the events giving rise to the assertion of unclean hands. The district court then held that CPA's conduct involving the Consents amounted to unclean hands and therefore it disallowed CPA's claims.

The district court did not hold that the Bankruptcy Court's findings of fact were clearly erroneous. However, while crediting the Bankruptcy Court's findings of fact, the district court concluded that CPA had fabricated evidence (i.e., the executed Consents) and had advocated before the Bankruptcy Court a theory of assignment that it knew not to be true. The district court also questioned the testimony that Jones gave before the Bankruptcy Court. Predicated on its own analysis, and drawing upon selected findings made by the Bankruptcy Court, the district court then concluded, contrary to the conclusion reached by the Bankruptcy Court, that CPA's conduct did have an immediate and necessary relationship with CPA's claims against New Valley.

The district court closed its opinion with the observation that "this Court must hold corporations responsible for their misconceived and improper conduct. Corporate ethics, professionalism, and verity are not lost on this Court, and when corporations denigrate these values through lack of candor . . . this Court will not countenance this type of conduct . . . [and will cause it] to apply the appropriate punishment." The district court's "appropriate punishment" here consisted of barring all relief to CPA, thereby denying CPA the $2,888,469.30 which the Bankruptcy Court had determined was due from New Valley.

This appeal followed.

IV.

In bankruptcy proceedings, we have determined that an abuse of discretion exists when "the [trial] court's decisions rests upon a clearly erroneous finding of fact, an errant conclusion of law, or an improper application of law to fact." In re Marvel Entertainment Group, Inc., 140 F.3d 463, 470 (3d Cir. 1998) (citations omitted). Here, as the district

9

court did not question the Bankruptcy Court's findings of fact, it concluded that the Bankruptcy Court had abused its discretion in not applying the unclean hands doctrine on the basis of an incorrect conclusion of law.

This court reviews findings of fact by the Bankruptcy Court under a clearly erroneous standard, and its conclusions of law under a plenary standard. In re Visual Indus., Inc., 57 F.3d 321 (3d Cir. 1995). Because the district court sits as an appellate court in bankruptcy cases, our review of the district court's decision is plenary. Id. at 324. See also Fellheimer, Eichen & Braverman, P.C. v. Charter Technologies, Inc., 57 F.3d 1215, 1223 (3d Cir. 1995).

CPA frames the issue as whether the Bankruptcy Court, "which presided over the lengthy proceedings and trial in this matter, abused its discretion in declining to apply" unclean hands. CPA referred us to Castle v. Cohen, 676 F. Supp. 620 (E.D. Pa. 1987), aff'd in part and remanded on other grounds, 840 F.2d 173 (3d Cir. 1988), 9 which had declined to apply the unclean hands doctrine to trustees of an employee stock ownership plan. In doing so, CPA identified five elements that must be present to warrant application of unclean hands against a party. CPA argued that the doctrine is applicable when: 1) a party seeking equitable relief; 2) is guilty of conduct involving fraud, deceit, unconscionability, or bad faith; 3) directly related to the matter in issue; 4) that injures the other party; and 5) affects the balance of equities between the litigants. CPA claims that essential elements of the unclean hands doctrine are lacking in the instant case.

In particular, CPA argued that there was no direct relationship between its conduct regarding the "Consent to Assignment" forms and its Proofs of Claim. CPA reinforces its argument by referring to the Supreme Court's "clean

_____

9. This court, affirming the Castle district court on this issue, held that
the district court had not abused its discretion in rejecting a claim that
the trustees had "unclean hands." We recited that under our "limited
scope of review on this issue [unclean hands], we cannot conclude after
reviewing the record [in Castle v. Cohen] that the district court's finding
on this point is clearly erroneous." Castle, 840 F.2d at 178.

10

hands" analysis in Keystone Driller Co. v. General Excavating Co., 290 U.S. 240 (1933), which, among other elements, requires that there be an "immediate and necessary relationship" between the conduct and the matters in litigation. The Supreme Court stated:

> [C]ourts of equity do not make the quality of suitors the test. They apply the maxim requiring clean hands only where some unconscionable act of one coming for relief has immediate and necessary relation to the equity that [the party] seeks in respect of the matter in litigation. They do not close their doors because of plaintiff's misconduct whatever its character, that has no relation to anything involved in this suit, but only for such violations of conscience as in some measure affect the equitable relations between the parties in respect of something brought before the court for adjudication. . . . They apply the maxim, not by way of punishment for extraneous transgressions, but upon considerations that make for the advancement of right and justice.

290 U.S. at 245. In Keystone, the plaintiff (Keystone) sued for patent infringement. In an earlier case, against different parties, Keystone had prevailed and its patents were declared valid. Keystone then used this first judgment to bring actions against other alleged infringers. In the second case, Keystone sought preliminary injunctions to protect the patents. The injunctions were denied, and the case proceeded to trial.

During the course of the trial in Keystone, it was discovered that Keystone, in its earlier case, had concealed evidence which questioned and may have tainted the validity of the patents. Affirming the Court of Appeals, the Supreme Court held that this conduct by Keystone constituted unclean hands and barred Keystone from recovery. The Supreme Court stated that the earlier decree of validity obtained in Keystone's first case was used as the basis of Keystone's action in its subsequent case. Keystone, 290 U.S. at 246. The Court inferred that "from the beginning it was plaintiff's intention through suppression of . . . evidence to obtain [a] decree in [the first case] for use in subsequent infringement suits against these defendants

11

and others." Id. at 247. Therefore, Keystone's misconduct had a direct relation to the relief sought, so as to bar recovery. Id.

Although here CPA acknowledges that the district court had determined that the Consents were "immediately and necessarily related" to the litigation before the Bankruptcy Court, it argues that the district court erred in reaching that conclusion. CPA contends that the district court's conclusion that CPA lied about the assignment "was never `asserted' in a manner that would constitute a fraud on the Bankruptcy Court."

CPA is persuasive in arguing that the doctrine of unclean hands should not be used to strip away millions of dollars in damages for conduct that the Bankruptcy Court had found was not related to CPA's claims. Indeed, CPA argues that unclean hands cannot be applied by way of punishment for an "extraneous transgression," see Keystone, 290 U.S. at 245, particularly where the "transgression" charged in this case had no relationship to the Moorestown lease.

It must be remembered that no "Consent to Assignment" form had ever been executed or was claimed by CPA to have been executed with respect to the Moorestown lease, and the Moorestown lease was responsible for more than two-thirds of the damages awarded by the Bankruptcy Court.10 CPA goes on to argue that to sustain the decision of the district court would be to grant New Valley "something for nothing," i.e. possession of CPA's property for years without adequate payment. Such a result, CPA claims, is alien to principles of equity.

_____

10. A fair reading of the Bankruptcy Court's opinion reveals that the Bankruptcy Court was concerned only with New Valley's challenges to the amount of CPA's claims, i.e., whether CPA's monetary claims arising out of the leases were inflated. As a consequence, the Bankruptcy Court did not find it necessary to decide any issue respecting the Consents to Assignment but dwelt only on the rental, maintenance, and other monetary charges that were the subject of CPA's Proofs of Claim. Hence, the Bankruptcy Court concluded, as do we, that the Consents had no relation to the merits of CPA's claim.

On the other hand, New Valley claims that the district court was correct in holding that CPA's conduct barred any recovery. Referring to our decision in Ciba-Geigy Corp. v. Bolar Pharmaceutical Company, Inc., 747 F.2d 844 (3d Cir. 1984), cert. denied, 471 U.S. 1137 (1985), New Valley charges that for unclean hands to be applied against a party, generally all that needs to be shown are the following: 1) an unconscionable act; 2) that affects the equitable relations between the parties; 3) concerning something brought before the court for adjudication. New Valley claims that we should focus on whether a party to a controversy has acted in such a manner as to "shock the moral sensibilities of the judge," and, citing to Gaudiosi, 269 F.2d at 882, contends that CPA's conduct was directly related to the claims at issue in the litigation. New Valley contends that merely because CPA abandoned its "fraudulent" claim before trial does not mean that its hands became clean after years of having advanced a theory in motion practice and discovery that both the Bankruptcy and district courts later discredited as a sham.

New Valley argued that what "CPA sought was afinding that FSI . . . was liable to it for damages under the leases; the proofs of claim were filed against New Valley in the event that CPA was unsuccessful in establishing FSI's liability."11 New Valley charged that to obtain that relief, CPA manufactured evidence and pursued a theory it knew to be false. "Moreover, CPA's conduct posed an enormous monetary risk to New Valley because New Valley was obligated to indemnify FSI against any liability under the Reno Lease."12

Relying upon Keystone, New Valley argued before us that there is a broader standard of when conduct is "related" for purposes of unclean hands. New Valley emphasized that CPA backdated documents and filed fraudulent proofs of claim before the Bankruptcy Court, and contended"[i]t strains credulity to accept CPA's contention that it backdated documents and manufactured evidence to

_____

11. New Valley Br. at 30.

12. Id. at 31.

13

support claims that it did not believe it had placed before the court."

V.

Although the parties disputed the applicability of equitable defenses to legal claims in a bankruptcy proceeding, we are far more concerned with the critical element of the unclean hands doctrine, i.e., the relationship between the challenged conduct of CPA pertaining to the Consents, and the rental and other monies sought by CPA as a result of the Reno and Moorestown leases. First and foremost, we are convinced by the Bankruptcy Court's findings and its conclusion that the Consents had no "immediate and necessary" relationship to the Proofs of Claim. The Proofs of Claims filed by CPA, by their own terms, reserved for litigation the dispute as to assignment of the leases. Inasmuch as the Bankruptcy Court'sfindings were not held by the district court to be clearly erroneous, nor can they be so held by us, those findings could not trigger the doctrine of unclean hands under our standard of review.

In our view, the primary principle guiding application of the unclean hands doctrine is that the alleged inequitable conduct must be connected, i.e., have a relationship, to the matters before the court for resolution. We will not refuse relief to a party merely because it has engaged in misconduct which is unrelated to its claims before the court. Only when "some unconscionable act of one coming for relief has immediate and necessary relation to the equity that" the party seeks, will the doctrine bar recovery. Keystone, 290 U.S. at 245. Here of course those issues involved CPA's Proofs of Claim which sought payment for monies due under New Valley's leases.

As an equitable doctrine, application of unclean hands rests within the sound discretion of the trial court. See, e.g., Ciba-Geigy, 747 F.2d at 855 (refusing to apply unclean hands). Moreover, neither we nor the Supreme Court has required, as argued by New Valley, that application of the unclean hands doctrine is mandatory. The precedents that we find controlling make clear that there must be a

14

relationship between the inequitable conduct and the claims brought before the court in order for the doctrine to apply; even then, the court has discretion to limit the reach of the doctrine to only some of the claims. See , e.g., Keystone, 290 U.S. 240; Ciba-Geigy, 747 F.2d 844.

The Supreme Court in Keystone held that"when assessing whether to invoke the doctrine of unclean hands, courts of equity must not be bound by formula or restrained by any limitation that tends to trammel the free and just exercise of discretion." 290 U.S. at 245-46. When applying the doctrine, the courts in this Circuit have generally been clear that the connection between the misconduct and the claim must be close. For example, in Monsanto v. Rohm & Haas Co., 456 F.2d 592 (3d Cir.), cert. denied, 407 U.S. 934 (1972), this Court upheld a judgment declaring a Monsanto patent invalid and unenforceable. 456 F.2d at 594. The Court found that Monsanto had misrepresented the properties of its product (a herbicide) in order to obtain a patent, although a claim for the same product had been rejected in an earlier patent application. Id. at 596-97. The claim of infringement brought by Monsanto therefore directly depended upon Monsanto's misrepresentations of Monsanto's own patent, thereby providing the essential relationship for application of the doctrine. Thus, this court, after citing to Keystone, id. at 598, found that the district court was correct in concluding Monsanto had come to court with unclean hands. Monsanto, 456 F.2d at 600.

Where this Court has not applied unclean hands, the misconduct alleged has not been directly related to the subject of the plaintiff 's suit. In Ciba-Geigy, we upheld the district court's grant of a permanent injunction in favor of Ciba despite allegations that Ciba had unclean hands. The district court found that evidence that Ciba had mislabelled drugs, sold adulterated batches of drugs and violated FDA regulations was insufficient to warrant application of unclean hands, as it did not involve nor relate to the matter of Ciba's claims against Bolar. Ciba-Geigy, 747 F.2d at 855. See also Northeast Women's Ctr. v. McMonagle, 868 F.2d 1342, 1354 (3d Cir.) (reversing the district court's ruling that unclean hands had precluded Northeast from

15

obtaining an injunction against the defendants because Northeast's alleged misconduct (violation of health regulations) had no relationship to the defendants' acts in interfering with Northeast's claims), cert. denied, 493 U.S. 901 (1989); General Dev. Corp. v. Binstein, 743 F. Supp. 1115, 1136 (D.N.J. 1990) (refusing to apply unclean hands despite evidence that General Development was a general "malefactor" because that evidence did not relate directly to the misrepresentations alleged in the complaint).

The two cases relied on most heavily by the parties are not to the contrary. As we have noted, Keystone, while holding that unclean hands precluded the plaintiff (Keystone) from the relief it sought, nevertheless requires an "immediate and necessary" relationship between the conduct and the claims at issue. In Keystone, that relationship was found to be present, and hence, the Supreme Court upheld application of the doctrine.

In Gaudiosi, this court applied the doctrine of unclean hands in a proxy contest context. Our court upheld the determination of the district court that Gaudiosi had tried to "intimidate" a set of investors by sending a letter to them in order to influence their votes. In doing so, Gaudiosi had violated SEC solicitation regulations. Gaudiosi, 269 F.2d at 879. While our court focussed on the integrity of the court when faced with an assertion of inequitable conduct, and while we explicitly stated that no injury needed to be shown, id. at 881-82, it is crystal clear from the facts of the case that Gaudiosi's misconduct -- the intimidation of shareholders -- was directly related to the case before the court, which concerned the validity of a corporate election.

Given these precedents and their uniform requirement of an "immediate and necessary" relationship between the challenged conduct and the claims for relief, we cannot sustain the district court's decision in this case, where that relationship is absent. The district court implicitly agreed with the Bankruptcy Court's determination that there was little connection between the Consents and CPA's claims. The district court, while emphasizing the actions of CPA in backdating the Consents to Assignment, at no time suggested that a direct relationship ever existed between CPA's conduct and CPA's Proofs of Claim.

16

Rather, in its opinion, the district court stated three reasons why unclean hands should prevent the recovery of monies by CPA. First, CPA had alleged a consent to assignment theory that it knew to be untrue; second, the testimony of Jones concerning the Consents strongly indicated a "selective memory;" and third, CPA misleadingly implied that it was confused as to which entity was CPA's tenant. It did so, despite some information in CPA's possession that indicated New Valley had remained CPA's tenant.

However, none of the issues which the parties disputed and which pertained to the Moorestown property were connected with the Consents to Assignment, and it was those issues that accounted for two-thirds of CPA's claims. The Consents, as noted earlier, related only to the Bridgeton and Reno leases. Moreover, the Consents simply have no relationship to CPA's claims for monies against New Valley arising out of New Valley's tenancy of Reno. Even more so, the Consents had no direct relationship to CPA's claims concerning Bridgeton. Those claims, as we have noted, had been settled earlier. Yet, the district court's reasons focus almost exclusively on the issue of the Consents.

Nor do the Proofs of Claim support the district court's holding. Indeed, under the district court's analysis, it is difficult to imagine what different or alternative language CPA could have used in its Proofs of Claim to reserve any of its rights against New Valley. The Proofs of Claim merely set forth the fact that CPA and New Valley had differing interpretations concerning the status of the leases. Had CPA waited until the assignment issue had been litigated, it would have been out of time in presenting its bankruptcy claims against New Valley.

We hold that the Bankruptcy Court (1) applied the correct legal standard, drawn from Keystone and Gaudiosi, which established the principle of direct relationship in the cases we have cited, and (2) was not clearly erroneous in its factfinding, when it concluded that there was no immediate and necessary relationship between New Valley's assertion of unclean hands and CPA's claims.

17

VI.

We will therefore reverse the Order of the district court
dated July 13, 1998, and remand to the district court for
further proceedings (see, e.g., note 8, supra) consistent with
this opinion.

A True Copy:
Teste:

      Clerk of the United States Court of Appeals
      for the Third Circuit